**IN THE UNITED STATES DISTRICT COURT**

**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| **v.** | : | **CRIMINAL NOS. 26-23 & 26-99** |
| **JALEN SMITH** | : | |

**GOVERNMENT'S SENTENCING MEMORANDUM**

The defendant, Jalen Smith, was one of the leaders in a far-reaching bribery, fraud, and point-shaving scheme that corrupted the integrity of National Collegiate Athletic Association ("NCAA") Division 1 men's basketball and caused substantial losses to victims of the scheme. Working with three other "fixers," Antonio Blakeney, Marves Fairley, and Shane Hennen, the defendant was the scheme's most prolific recruiter and manager of corrupt players. He recruited dozens of players to participate in the scheme, encouraged them to recruit teammates, directed them in fixing games, maintained frequent communications with them to ensure the scheme succeeded, and then orchestrated and personally delivered the bribe payments to the players. While managing these corrupt players, the defendant also remained in regular contact with the other leaders, who were recruiting additional players and placing fraudulent wagers.

The scope of the scheme was extraordinary. The scheme involved more than 39 players on more than 17 different NCAA basketball teams who fixed and attempted to fix more than 29 games. The scheme resulted in more than $3 million in fraudulent wagers placed on these games, and more than $1.1 million in financial losses to sportsbooks throughout the country. But the harm extends well beyond the dollars lost. The defendant and his cohorts deliberately corrupted the fundamental principles on which competitive sports depend—fairness, honesty, and respect for the rules of competition—and he did so because of greed. The defendant aimed a wrecking

ball at the integrity of college basketball, caring only about how much money he could generate by illegally manipulating the outcome of the games. His conduct injured the NCAA, the schools and athletic programs involved, the players and coaches who played by the rules, the fans who trusted the games were honestly contested, and legitimate bettors. The defendant's central role in this scheme calls for serious punishment.

However, this was not the defendant's only serious offense. While engaged in this extensive bribery, fraud, and point-shaving scheme, he also possessed a stolen semiautomatic firearm despite being a convicted felon with prior felony drug trafficking convictions. His possession of the firearm was not an isolated mistake by someone unfamiliar with the criminal justice system. It was a knowing violation of the law by a repeat drug trafficker who was already prohibited from possessing firearms and who was, at the same time, engaged in another serious and ongoing criminal scheme. The firearm offense therefore provides an additional and significant reason for a substantial sentence: even after his prior convictions, the defendant continued to disregard the law while participating in serious criminal conduct.

In this case, the defendants' crimes have been consolidated for sentencing. Although the firearm offense only minimally increases the applicable guidelines range, the combined seriousness of his conduct warrants a sentence at the higher end of the guideline range of 70 to 87 months in prison, subject to any additional information presented at the hearing and in the Sealed Supplement. Such a sentence would appropriately reflect the defendant's leadership role in an extensive scheme that corrupted college basketball on a national scale, his substantial financial and institutional harm, and his continued willingness to violate the law—including by possessing a firearm despite his prior felony drug trafficking. It would also serve the important

purposes of punishment and deterrence, including deterring others who might be tempted to corrupt institutions and exploit public trust for what they perceive to be "easy" money.

## I. SUMMARY OF CRIMINAL CONDUCT

### A. The Bribery, Fraud, and Point-Shaving Scheme Generally

Beginning in or about September 2022, a group of individuals worked together to recruit and bribe players to help influence or "fix" Chinese Basketball Association ("CBA") games through "point shaving" during the 2022-2023 season. The fixers bribed CBA players to fix games and then, through various gambling outlets, placed large wagers on those games against the teams whose players they had bribed. The fixers involved in this CBA aspect of the scheme included Antonio Blakeney, Marves Fairley, and Shane Hennen.

After profiting on the fixed CBA games, the fixers turned their attention to NCAA men's basketball games. During the 2023-2024 and 2024-2025 NCAA men's basketball seasons, the fixers agreed to recruit NCAA players who would accept bribe payments in exchange for helping to influence outcomes of NCAA basketball games. In particular, the fixers agreed to recruit into the scheme players who would help ensure that their team failed to cover the spread of the first half of a game or an entire game. The fixers would then place wagers on those games through the gambling outlets, betting against the team whose player or players they had bribed to engage in this point-shaving scheme.[1] Because of the proliferation of legalized sports betting, the fixers could use numerous gambling outlets to make their bets on these games and conceal the scheme

[1] Obtaining complete information on bets placed by individuals is impossible. There are numerous betting outlets in the United States and elsewhere, legal and illegal, and numerous ways to make bets that cannot be traced. The government has identified in this memorandum and seeks to hold the defendant responsible (as set forth in the stipulations in the plea agreement) only for the bets that it could find that were attributable to the scheme.

from authorities. The fixers also expanded the group of individuals involved in leading the scheme, fixing games, and recruiting players to participate in the scheme. Those additions included, among others, Jalen Smith, Roderick Winkler, and Alberto Laureano.

Five of the fixers, Jalen Smith, Antonio Blakeney, Marves Fairley, Roderick Winkler, and Alberto Laureano, then approached and communicated with NCAA basketball players, in person and through social media and cellular telephone calls. In these communications, the fixers offered the players bribe payments, usually ranging from $10,000 to $30,000 per game, to participate in the scheme. The fixers also attempted to recruit multiple players from a team to join the bribery scheme and further ensure its success. Many of these players accepted the offers and agreed to help fix specific games so that the fixers would win their wagers. The fixers targeted for their scheme NCAA basketball players for whom the bribe payments would meaningfully supplement or exceed legitimate NIL opportunities.

Smith, Blakeney, Fairley, Winkler, and Laureano had credibility with many of the players and could approach them to engage in this scheme because of their prominence, experience, and reputation in local and national basketball communities. Smith was a resident of North Carolina who was active in the training and development of basketball players for professional scouting combines. Blakeney was a resident of Florida and a former McDonald's All-American and college basketball player who also played professional basketball in the National Basketball Association ("NBA") and overseas and who had himself accepted bribes from his co-schemers to underperform in CBA games. Fairley was a resident of Mississippi and a high-stakes sports gambler, social media influencer, and sports handicapper who sold betting advice to others. Winkler was a resident of Arkansas and a former coach and trainer for high school and Amateur

Athletic Union ("AAU") basketball teams and players. Laureano was a resident of New York and a former college basketball player.

As the fixers had agreed, Smith, Blakeney, Fairley, Winkler, and Laureano then communicated with the NCAA basketball players who had agreed to participate in the bribery scheme and directed them to underperform or otherwise help influence the outcome of particular games or a specific portion (generally the first half) of particular games.

Smith, Blakeney, Fairley, Winkler, Laureano, and Shane Hennen, a resident of Philadelphia and Nevada and a high-stakes sports gambler, as well as other co-schemers, then placed bets with numerous gambling outlets on NCAA men's basketball games involving the bribed NCAA players. They placed these bets in a manner that was consistent with the way in which they had arranged to fix the outcome of a game, or a portion of a game, to maximize their chances of winning their wagers. The bribed NCAA players then influenced, attempted to influence, and conspired to influence the outcome of their games through intentionally poor performances, removing themselves from games, supporting their teammates who were also involved in the scheme, and through other means.

At times, while Hennen was in the Eastern District of Pennsylvania, the other fixers communicated and strategized about the scheme with Hennen, and Hennen placed bets on the fixed games with online gambling outlets and in person at casinos. At least one of those fixed games occurred in the Eastern District of Pennsylvania. In addition, individual bettors unaware of the scheme placed bets on the fixed games, often on the other side of the fixers' bets, in the Eastern District of Pennsylvania, resulting in losses to the individual bettors.

When the fixers were successful with their wagers on fixed games, Smith and other co-schemers traveled to NCAA school campuses and made cash bribe payments to the players who had agreed to participate in the scheme. On at least one occasion, Smith traveled to the Eastern District of Pennsylvania through the Philadelphia International Airport to pay one of the bribed players.[2]

**B. Smith's Involvement in the Bribery, Fraud, and Point-Shaving Scheme**

Jalen Smith's specific involvement in the scheme included, but was not limited to, the activity described below and in the indictment. For example:

In mid-February 2024, the fixers, including Jalen Smith, recruited for their point-shaving scheme Oumar Koureissi and Diante Smith, both forwards on the Nicholls State University Colonels Men's Basketball Team ("Nicholls State"). The recruiting of the players in this and other aspects of the scheme discussed below involved Smith reaching out to the players by text and social media and speaking with the players on FaceTime and on the telephone. Smith often engaged with Blakeney, Winkler, and Laureano in these recruiting efforts. Jalen Smith had a leadership role in the scheme, particularly in recruiting, managing, supervising, and paying the players for their role in the scheme. He was the primary communicator with the players during the operation of the scheme.

[2] In placing these wagers on games they had fixed, the defendants defrauded sportsbooks, as well as individual sports bettors, who were all unaware that the defendants had corruptly manipulated the outcome of these games. The sportsbooks would not have paid out those wagers had they known that the defendants fixed those games. Individual sports bettors also would not have bet on those games as they did if they had known that the defendants had fixed those games.

Smith and the other fixers succeeded in their recruiting efforts with Nicholls State, and Koureissi and Diante Smith underperformed in the game between Nicholls State and the McNeese State University Cowboys Men's Basketball Team ("McNeese State") on February 17, 2024. Koureissi and Diante Smith ensured that Nicholls State did not cover the spread in the game in exchange for bribe payments for each player of approximately $20,000. The fixers placed wagers with numerous sportsbooks totaling at least approximately $100,000 on McNeese State. As a result of the scheme, the fixers won their bets. Shortly after this game, Jalen Smith traveled to Louisiana to arrange for the delivery of approximately $32,000 in cash bribe payments to Koureissi and Diante Smith.

In or about mid-February 2024, the fixers, including defendant Jalen Smith, attempted to recruit for their point-shaving scheme players (identified in the indictment as Person #1 and Person #2) on the Northwestern State University Demons Men's Basketball Team ("Northwestern State"). The fixers offered bribe payments to two players on the Northwestern team to underperform on February 19, 2024, in a game against Texas A&M-Corpus Christi. The fixers wagered at least $231,000 on Texas A&M-Corpus Christi to cover the full-game spread. Most of the fixers' bets on this game failed as Texas A&M-Corpus Christi did not cover most of the spreads.

In mid to late February 2024, the fixers, including Jalen Smith, recruited players, including Bradley Ezewiro, a center, and another player (identified in the indictment as Person #3), on the St. Louis University Billikens Men's Basketball Team ("St. Louis") to participate in the game-fixing scheme. Those players agreed to underperform in an upcoming St. Louis game against the Duquesne Dukes Men's Basketball Team ("Duquesne") on February 20, 2024, to

ensure that St. Louis failed to cover the first-half spread in that game. The fixers placed wagers totaling at least approximately $242,000 on Duquesne to cover the first-half spread. The scheme succeeded for this game, and the fixers won their bets.

After this game, Jalen Smith and Ezewiro discussed in text messages Ezewiro recruiting players on other NCAA men's basketball teams who might participate in the scheme. In connection with one of those players, Smith sent to Ezewiro a photograph of stacks of cash, acknowledging the large amount of money NCAA players could make by point shaving, with the message, "Send that to him if he bite he bite if he don't so be it lol." Smith later texted Ezewiro that they needed to "clean up how we text" and agreed to speak further about the scheme on a "burner" telephone or a secret social media account, in an attempt to conceal from authorities the point-shaving scheme.

In or around mid-February, the fixers, including Jalen Smith, attempted to recruit for their point-shaving scheme players on the La Salle University Explorers Men's Basketball Team ("La Salle"). The fixers offered the La Salle players bribe payments to underperform in and influence the first half of an upcoming game against the St. Bonaventure University Bonnies Men's Basketball Team ("St. Bonaventure") on February 21, 2024. The fixers placed wagers with various sportsbooks totaling at least $247,000 on St. Bonaventure to cover the first-half spread, including a $30,000 wager with FanDuel Sportsbook at Live! Casino in Philadelphia, Pennsylvania. Those bets all failed as La Salle covered the spread.

In or about late February 2024, Jalen Smith recruited for their scheme Elijah Gray, a forward, and another player (identified in the indictment as Person #4) on the Fordham University Ram's Men's Basketball Team ("Fordham"), and a teammate of Gray. Gray knew

and trusted Smith because of their mutual connections in the basketball community in North Carolina. Smith offered, and Gray and his teammate accepted, a bribe payment of approximately $10,000 or $15,000 to underperform in an upcoming Fordham basketball game on February 23, 2024, against the Duquesne University Dukes Men's Basketball Team ("Duquesne"). The fixers wagered at least approximately $195,000 on Duquesne, most of which were on Duquesne to cover the full-game spread. Despite Gray's efforts to underperform and fix the game, Fordham covered the spread, and the fixers lost their bets.

Shortly after this game, Smith and Gray communicated via text concerning the efforts of Gray and his teammate to fix the game and the failure of the scheme to succeed. Gray told Smith, "I tried," and noted that the Duquesne players were "not hoopin," or played poorly, making it harder for Duquesne to cover the spread. Smith told Gray, "You did your job for sure," and bemoaned the fact that another Fordham player who was not involved in the scheme had an excellent game.

In late February 2024, Smith and other fixers recruited multiple players on the Buffalo Men's Basketball Team to participate in the point-shaving scheme. Those players included Isaiah Adams, as well as Shawn Fulcher, a guard, and another player (identified in the indictment as Person #5). Fulcher helped recruit Adams to participate in the scheme, and both of those players helped recruit their teammate, Person #5.

The Buffalo players agreed, in exchange for bribe payments, to underperform in several games, including: (1) the game against the Western Michigan University Broncos Men's Basketball Team ("Western Michigan") on February 24, 2024; (2) the game against the Kent State University Golden Flashes Men's Basketball Team ("Kent State") on February 27, 2024;

and the game against the Ohio University Bobcats Men's Basketball Team ("Ohio") on March 5, 2024. In particular, the players agreed to help ensure that Buffalo failed to cover the first-half spread in those games.

The fixers placed substantial bets on those games, betting against Buffalo in the first half, with bets totaling at least $90,000 on the Western Michigan game, at least $424,000 on the Kent State game, and at least $7,500 on the Ohio game. The scheme was successful with those games.

Around the time of these games, Jalen Smith arranged for the delivery of bribe payments to the Buffalo players on the Buffalo campus, including by making a payment through Alberto Laureano of $54,000 on March 2, 2024. While Laureano was driving to Buffalo to make the payment, he texted the players a photograph of the inside of his car, revealing a large stack of cash in an open compartment. In setting up this delivery, Smith texted with the Buffalo players, telling them that he was going to deliver the "bread [money]" and attached a photograph of the interior of an airplane to further demonstrate that he was holding up his end of the bribery bargain.

In late February 2024, the fixers, including Jalen Smith, recruited players on the DePaul University Blue Demons Men's Basketball Team ("DePaul") to participate in the point-shaving scheme. Those players included Micawber Etienne, Jalen Terry, and Da'Sean Nelson, as well as another player (identified in the indictment as Person #6). The players agreed, in exchange for bribe payments, to underperform in several games, including: (1) the game against the Georgetown University Hoyas Men's Basketball Team ("Georgetown") on or about February 24, 2024; (2) the game against the Butler University Bulldogs Men's Basketball Team ("Butler") on

March 2, 2024; and (3) the game against the St. John's University Red Storm Men's Basketball Team ("St. John's") on March 5, 2024.

The fixers placed substantial bets on those games, betting against DePaul in the first half, with bets totaling at least $27,000 on the Georgetown game, at least $123,789 on the Butler game, and at least $52,395 on the St. John's game. The scheme was successful in all three games, and the fixers won their bets.

Smith engaged in text messaging with the players throughout the scheme, communicating to them information about the scheme and encouraging their successful participation. For example, around halftime of the Georgetown game, when it was clear that the point-shaving scheme was succeeding, Smith texted Etienne about arranging to pay the bribe money and complimented Terry and Nelson for underperforming as they had agreed: "I love Jalen terry he perfected his job . . . Sh*t Nelson snapped too." During the St. John's game, Jalen Smith texted Etienne to complain that one of the players who was not involved in the point-shaving scheme was playing well and needed to "chilllll [the f*ck] out." Smith further told Etienne and the DePaul players that if they followed through on the scheme, bribe payments would be "on the way."

In late February 2024, the fixers, including Jalen Smith, recruited for their point-shaving scheme players on the Robert Morris University Colonials Men's Basketball Team ("Robert Morris")—Markeese Hastings, a forward, and two other players (identified in the indictment as Person #7 and Person #8). In exchange for bribe payments, the players agreed to underperform in a game on February 28, 2024, against the Northern Kentucky University Norse Men's Basketball Team ("Northern Kentucky"). The fixers then wagered at least $256,000 on Northern Kentucky

to cover the first-half spread. To increase the profitability of their scheme, these wagers (as with many other wagers in this case) included "parlays" on this game along with other games that the schemers had fixed by bribing players. The players succeeded in their underperformance, and the fixers won their bets.

After this game, Smith texted with Hastings to arrange the delivery of the bribe payments to the players while they were in Fort Wayne, Indiana, where Robert Morris was playing their next game. In these communications, Smith sent Hastings a screen shot of a FaceTime call with his co-schemers, including Fairley, Winkler, and Blakeney, who were coordinating with Smith to provide the cash to pay the Robert Morris players. Hastings texted Smith to express his eagerness in continuing to participate in the point-shaving scheme: "We might as well do the next one too . . . . [this] was too easy." Smith agreed, telling Hastings to "[s]ay less." On February 29, 2024, in further text message communications with Blakeney about obtaining cash for the bribe payments said they should talk on the phone: "can't text too crazy."

On March 5, 2024, Smith and Hastings texted about point shaving in the Robert Morris game against the Purdue University Fort Wayne Mastodons Men's Basketball Team ("Purdue F.W.") that was taking place that evening. Smith texted Hastings shortly before the game, "No questions about it u need to be beat by 12 at half no funny sh*t." Shortly after the game, which Hastings and his teammates succeeded in fixing, Smith told Hastings that his bribe payments would be forthcoming, "Money good u know that lol." The fixers won bets totaling at least $50,000 on this game, and Smith arranged for the delivery of bribe payments to Hastings and his corrupt teammates in Chicago.

In late February 2024, the fixers, including Jalen Smith, recruited for their point-shaving scheme Arlando Arnold, a guard, as well as two other players (identified in the indictment as Person #9 and Person #10) on the University of Southern Mississippi Golden Eagles Men's Basketball Team ("Southern Mississippi"). The players agreed to underperform in a game against the University of South Alabama Jaguars Men's Basketball Team ("South Alabama") on February 28, 2024. The fixers then placed wagers of at least $275,000 on South Alabama to cover the first-half spread (including parlay wagers). Despite the efforts of Arnold and the other players in the scheme to underperform in the first half of the game, the fixers lost their bets.

Arnold then agreed to make up for the betting losses by helping to fix an upcoming Southern Mississippi game against the University of Louisiana at Lafayette Rajin' Cajuns Men's Basketball Team ("Louisiana-Lafayette") On March 1, 2024. The fixers placed wagers on this game totaling at least $161,000 on Louisiana-Lafayette to cover the first-half spread. The players succeeded in underperforming in this game, and the fixers won their bets. Marves Fairley then made the bribe payments of tens of thousands of dollars to the corrupt players. Later, in December 2024, Arnold worked with Jalen Smith to attempt to recruit three players for the scheme on the Southern Mississippi basketball team.

In late February 2024, the fixers, including Jalen Smith, recruited for their point-shaving scheme Camian Shell, a guard, and another player (identified in the indictment as Person #11) on the North Carolina A&T State University Aggies Men's Basketball Team ("North Carolina A&T"). In exchange for bribe payments, Shell and his teammate agreed to underperform in a game on February 29, 2024, against the Towson University Tigers Men's Basketball Team

("Towson"). The fixers then placed wagers totaling at least $458,000 on Towson, mostly on the first half.

In the hours leading up to the game, Smith texted Shell about the details of the scheme. For example, Smith directed Shell to ensure that North Carolina A&T failed to cover the spread and that the score not be close: "10 or more points bro[,] we should[n']t need sweating sh*t." Smith then told Shell that he would pay other North Carolina AT&T players if Shell needed them for the point-shaving scheme during the game: "If it start looking shaky[,] tell 2 or 3 other [North Carolina AT&T players] what it is and they paid too." Shell answered affirmatively, adding a "love" emoji to Smith's text. Shell and Person #11 then underperformed in the game as they had agreed, and the fixers won their bets. Smith then arranged to deliver the bribe payments to Shell.

In late February 2024, the fixers, including Jalen Smith, recruited for their point-shaving scheme Simeon Cottle, a guard, and Demond Robinson, a forward, and another player (identified in the indictment as Person #12) on the Kennesaw State University Owls Men's Basketball Team ("Kennesaw State"). In exchange for bribe payments, the players agreed to underperform in a game on March 1, 2024, against the Queens University Royals Men's Basketball Team ("Queens"). Smith texted Cottle before the game, "I need both of y'all on FaceTime with me twice today so let's see if we can do a call right after shoot around . . . . just to make sure y'all good and really locked in . . . . [T]his money guaranteed[,] ima be at the game with [the money] so I just don't want no issues all yall end." Cottle responded affirmatively to this text and reassured Smith that they were ready. Smith then sent Cottle a photograph of approximately $100,000 in cash that Smith was carrying on the plane, acknowledging the large amount of

money at stake in the point-shaving scheme and Smith's commitment to making bribe payments to the Kennesaw State players for their participation in the scheme. The fixers wagered at least $20,000 on Queens to cover the first-half spread and won their bets after the players underperformed as they had agreed.

The next day, Smith texted with Cottle to arrange to deliver the bribe payments, with Smith telling Cottle that he was "brin[g]ing money to the school and handing it to YOU." Cottle later provided Smith with an address for the delivery of the bribe payments on the campus of Kennesaw State, and Smith texted Cottle that he would bring the "bread," or bribe payment, to him there. Smith and Fairley then arranged for a co-schemer to deliver approximately $40,000 in cash to Cottle the players involved in the scheme. Cottle then tried to recruit other players for the scheme, and Smith offered to "flash 200k [$200,000] or sumn to help persuade" those players.

In early March 2024, the fixers, including Jalen Smith, recruited for their point-shaving scheme players on the Coppin State University Eagles Men's Basketball Team ("Coppin State"). The fixers offered a player (identified as Person #13 in the indictment) bribe payments to underperform in the game against the South Carolina State University Bulldogs Men's Basketball Team ("South Carolina State") on March 4, 2024. Person #13 agreed to participate in the scheme, and the fixers placed wagers on the game. However, those bets failed as Coppin State covered the spread.

Around halftime of this game, when the score of the game was tied, Smith texted Person #13. Smith expressed his concern about the score of the game and urged Person #13 to underperform in the second half so that South Carolina State would cover the spread: "Wtf [what the f*ck] u doing[,] it need to be a blowout . . . You hooping yo ass off wtf [what the f*ck] . . . U

supposed to be f*cking losing[,] you costing us money . . . Get yo ass blow[n] out next half bro . . . .” Person #13 responded to Smith in a text message after the game and explained that South Carolina State was playing so poorly that it was difficult for Person #13 to ensure that Coppin State lose the game by more than the point spread: “[T]hey [South Carolina State] so ass I couldn’t even keep they lead together[,] im sorry for th[a]t bro[,] I try to tell my [Coppin State] teammates to chill and all th[a]t bro[,] swear I tried everything in my power second half.”

In March 2024, the fixers, including Jalen Smith, recruited for their point-shaving scheme Carlos Hart, a guard on the University of New Orleans Privateers Men’s Basketball Team (“New Orleans”). In exchange for bribe payments, Hart agreed to underperform (and recruited a teammate, identified as Person #14 in the indictment, to join him in the scheme) in the game against the Lamar University Cardinals Men’s Basketball Team (“Lamar”) on March 11, 2024. The fixers then bet at least $150,000 on Lamar to cover the full-game spread. Hart and his teammate underperformed as they had agreed, and the fixers won their bets. Fairley then arranged for a co-schemer to deliver $20,000 in cash to Hart at a casino in Biloxi, Mississippi, which he did.

In or about March 2024, the fixers, including Jalen Smith, recruited for their point-shaving scheme Airion Simmons, a forward on the Abilene Christian University Wildcats Men’s Basketball Team (“Abilene Christian”). In exchange for bribes, Simmons agreed to underperform in an upcoming game and help recruit for the scheme additional players on the Abilene Christian team. Simmons then recruited a teammate for the scheme, and (at the direction of Smith and the fixers) they underperformed in the game against the Texas A&M University-Corpus Christi Islanders Men’s Basketball Team (“Texas A&M-Corpus Christi”) on March 19,

2024. The fixers wagered at least $82,000 on Texas A&M-Corpus Christi to cover the first-half and full-game spreads. These bets were unsuccessful as Abilene Christian covered the spreads.

Simmons then agreed with Smith and the fixers to help ensure that Abilene Christian failed to cover the first-half and full-game spreads in their upcoming game on or about March 20, 2024, against the Tarleton State University Texans Men's Basketball Team ("Tarleton State"). The fixers wagered at least $40,000 on Tarleton State to cover the first-half and full-game spreads. Simmons and his corrupt teammate then underperformed in that game as they agreed, and the fixers won their bets.

For the 2024-2025 season, Jalen Terry transferred from DePaul to play for the Eastern Michigan State University Eagles Men's Basketball Team ("Eastern Michigan"). Having fixed games as part of this point-shaving scheme with DePaul, Terry continued to engage in this scheme while playing for Eastern Michigan.

In November and December 2024, Smith and Terry communicated via text and telephone about selecting games for the scheme and identifying players whom Terry could recruit, including Da'Sean Nelson who also had transferred to Eastern Michigan. For example, on November 21, 2024, Smith texted Terry that he needed to recruit his Eastern Michigan teammates for the point-shaving scheme, and they could all make large amounts of money in the scheme: "Need all yall like last year and it's a lock money super duper good let's work." Terry and Nelson agreed to fix the game on November 21, 2024, against Oakland University Golden Grizzlies Men's Basketball Team ("Oakland"). The fixers then placed tens of thousands of dollars in wagers on Oakland to cover the first-half spread against Eastern Michigan. Terry and Nelson underperformed in this game as they had agreed, and the fixers won their bets. The next

day, Smith arranged for the delivery of the bribe payments to Terry who confirmed with Smith in text messages that he received the money: "Got it. Counting now."

At Smith's direction, Terry and Nelson then fixed another game on December 21, 2024, against the Wright State University Raiders Men's Basketball Team ("Wright State"). After engaging in explicit texts about fixing the game and Smith making bribe payments to Terry (*e.g.*, "I will personally meet you after the game on my f*cking soul WITH EVERYTHING like I said I'll send 3k [$3,000] right now. . . ."), Smith texted, "We gotta stop ta[l]king so crazy on the text," acknowledging the need to limit text message communications between each other to conceal the scheme from authorities. Terry and Nelson then underperformed in this game as they had agreed, and the fixers won their bets. Smith then arranged for making additional bribe payments to Terry.

For the 2024-2025 season, Shawn Fulcher transferred from Buffalo to Alabama State University to play for the Alabama State University Hornets Men's Basketball Team ("Alabama State"). Jalen Smith continued his corrupt relationship with Fulcher, and they agreed that Fulcher would fix games with his new team and recruit other players on his team to join the point-shaving scheme, including a guard on the team, Corey Hines, as well as two other teammates (identified as Person #16 and Person #17 in the indictment).

Smith and Fulcher discussed the scheme in text message communications. For example, on November 10, 2024, Smith told Fulcher that if he successfully recruited for the scheme Corey Hines, Person #16, and Person #17, "on my mama u [Fulcher] gone be a rich young man this year," given all of the bribe payments Fulcher would receive. Fulcher told Smith that he got

Hines and the other players on board: "And I spoke to [Hines,] I told [Hines] straight up. don't not try no extra sh*t today or get off crazy and i got sum extra bread [money] for you."

On December 5, 2024, Smith, Fulcher, Hines, Person #16, and Person #17 communicated via text about the point-shaving scheme. In exchange for bribe payments, the players agreed to underperform in and influence the game later that day against the Southern Mississippi Golden Eagles Men's Basketball Team ("Southern Mississippi"). Smith told the players, "Lose by 6 full game no excuses on yall end I ain't got no excuses on my end I'm make sure yall situated." Smith then emphasized his point, telling the Alabama State players to lose by "like 8" so that he would not "stress." Fulcher and his teammates all agreed to follow Smith's instructions. Smith then sent a photograph of a large stack of cash that he said he was betting on the game, reminded the players of the spread, and told them that he was going to pay them in $100 bills if the point-shaving scheme succeeded. Smith then attempted unsuccessfully to place a $50,000 wager at a casino in Kentucky on Southern Mississippi to cover the full-game spread. The casino allowed a much smaller, $860 wager. The players then succeeded in fixing the game as they had agreed, but Smith failed to pay them the bribe money as he had agreed.

At the end of the first half of this game, Alabama State led Southern Mississippi 33 to 30, causing Smith to send text messages to Fulcher and his Alabama State teammates expressing his concern about the score of the game. Smith urged the Alabama State players to play poor defense, telling them to "LET [the Southern Mississippi players] LAY IT UP." Person #17 responded to the text messages, conveying his commitment to the scheme and explaining that Southern Mississippi was "so bad" that the players were having trouble throwing the game.

In late December 2024, the fixers, including Jalen Smith, recruited for their point-shaving scheme Dyquavion Short and Cedquavious Hunter, both guards on the University of New Orleans Privateers Men's Basketball Team ("New Orleans"). The fixers also attempted to recruit for the scheme other New Orleans players (identified in the indictment as Person #18 and Person #19). Short and Hunter agreed to underperform in at least three New Orleans basketball games, ensuring that New Orleans did not cover the spread in those games. Smith and the fixers placed bets on New Orleans' opponents in each of the games to cover the full-game spread. After the bets succeeded, Smith and Fairley and other fixers arranged for the delivery of thousands of dollars in bribe payments to Short and Hunter. The three fixed New Orleans games included (1) the game on December 28, 2024, against the McNeese State University Cowboys Men's Basketball Team ("McNeese State"); the game on December 30, 2024, against the Vanderbilt University Commodores Men's Basketball Team ("Vanderbilt"); and the game on January 11, 2025, against the Southeastern Louisiana University Lions Men's Basketball Team ("Southeastern Louisiana").

On May 21, 2025, Jalen Smith consented to a voluntary interview about this scheme with FBI agents. Smith confessed to the criminal activity as described above.

### C. <u>**Smith's Possession of a Firearm by a Felon**</u>

In May 2025, in connection with the bribery and wire fraud offenses discussed above, FBI agents obtained and executed a federal search warrant for Smith's residence at 1009 Druid Circle, Charlotte, North Carolina. During a search of Smith's bedroom, agents found a Khar Arms CT380 semi-automatic pistol, bearing serial number CAB1225, loaded with 5 live rounds

of .380 caliber ammunition, in a hamper underneath some clothing. The firearm was later determined to have been reported stolen.

In a voluntary interview with FBI Agents, Smith admitted that the firearm belonged to him but said that he had forgotten that it was in his bedroom. Smith further admitted to purchasing the firearm off the streets a few years ago from an unknown male outside a sneaker store in Charlotte, North Carolina. Smith stated that the firearm never left his control since he purchased it.

Smith was prohibited from possessing a firearm. At the time he committed the charged firearms offense here (May 21, 2025), and at all times following his prior conviction and sentence described below, Smith knew that he had been convicted on two felony counts of possession with intent to distribute a controlled substance on January 8, 2018, in Watauga County, North Carolina, and was sentenced to 6 to 17 months' imprisonment and 24 months' probation.

## II. LEGAL STANDARD

A sentencing court follows a two-step process, first calculating the range under the Sentencing Guidelines, and then considering that range along with all pertinent 18 U.S.C. § 3553(a) factors in determining the appropriate sentence. *See* USSG § 1B1.1 (Nov. 1, 2025).[3]

At the second step of the sentencing process, the Court must consider the advisory guideline range along with all the pertinent § 3553(a) factors in determining the final sentence.

[3] Courts previously followed a three-step process, in which the court first calculated the guideline range, then next ruled on motions for departure, before considering the 3553(a) factors. *See United States v. Gunter*, 462 F.3d 237, 247 (3d Cir. 2006). In an extensive amendment to the Guidelines effective November 1, 2025, the Sentencing Commission eliminated the departure provisions in the manual and dictated the two-step process described above.

"The record must demonstrate the trial court gave meaningful consideration to the § 3553(a) factors. . . . [A] rote statement of the § 3553(a) factors should not suffice if at sentencing either the defendant or the prosecution properly raises 'a ground of recognized legal merit (provided it has a factual basis)' and the court fails to address it." *United States v. Cooper*, 437 F.3d 324, 329-30 (3d Cir. 2006) (citations omitted).

The government explains below its view of the proper consideration in this case of the advisory guideline range and of the § 3553(a) factors.

## III. SENTENCING CALCULATION

### A. Statutory Maximum Sentence

The Court may impose the following statutory maximum sentences:

In Criminal No. 26-23, for Count One of the indictment, charging bribery in sporting contests, and aiding and abetting, 5 years' imprisonment, 3 years of supervised release, a $250,000 fine, and a $100 special assessment; for Counts Two and Five, conspiracy to commit wire fraud and wire fraud, 20 years' imprisonment, 3 years of supervised release, a $250,000 fine, and a $100 special assessment, on each count. The total permissible statutory maximum sentence on the charges in the indictment is 45 years' imprisonment, 3 years of supervised release, a $750,000 fine, and a $300 special assessment. Full restitution also shall be ordered. Forfeiture of all proceeds from these offenses also may be ordered.

In Criminal No. 26-99, for Count One of the information, charging possession of a firearm by a felon, 15 years' imprisonment, 3 years of supervised release, a fine of $250,000, and a $100 special assessment. Forfeiture of all firearms and ammunition involved in the offense may be ordered.

Considering both the indictment and the information discussed above, the total permissible statutory maximum sentence that the defendant faces is 60 years' imprisonment, 3 years of supervised release, a $1,000,000 fine, and a $400 special assessment. Full restitution also shall be ordered. Forfeiture of all proceeds from these offenses and forfeiture of all firearms and ammunition involved in the firearms offense also may be ordered.

**B. <u>Sentencing Guidelines</u>**

The government agrees with the sentencing guideline calculation as set forth in the Presentence Investigation Report ("PSR"):

For the bribery and fraud offenses, under USSG § 2B1.1(a)(1), the base offense level for wire fraud is 7. Under USSG § 2B1.1(b)(1)(I), the loss was more than $1,500,000 but less than $3,500,000, resulting in a 16-level increase to the base offense level. Under USSG § 2B1.1(b)(2)(A)(i), the offense involved more than 10 victims, resulting in a 2-level increase to the base offense level. Under USSG § 3B1.1(b), the defendant was a manager or supervisor (but not an organizer or leader) of the bribery and fraud offenses, and that criminal activity involved five or more participants and was otherwise extensive, resulting in a 3-level increase to the base offense level. This results in an adjusted offense level of 28. PSR ¶¶ 129-35.

For the firearms offense, under USSG § 2K2.1(a)(4)(A), the base offense level is 20, because the defendant possessed the firearm after sustaining one felony conviction for a controlled substance offense. Under USSG § 2K2.1(b)(4)(A), the firearm was stolen, resulting in a 2-level increase to the base offense level. This results in an adjusted offense level of 22. PSR ¶¶ 136-41.

Under USSG § 3D1.4The defendant then receives a multiple count adjustment for the two groups of offenses, increasing the adjusted offense level of 28 to 29. PSR ¶¶ 142-45.

Under USSG § 3E1.1(a) and (b), the defendant accepted responsibility and did so in a timely manner, resulting in a 3-level downward adjustment. PSR ¶¶ 147-48.

This results in a total offense level of 26. The defendant is in Criminal History Category II, yielding a sentencing guideline range of 70 to 87 months in prison. PSI ¶ 219.

## IV. GOVERNMENT'S RECOMMENDATIONS CONCERNING SENTENCING

### A. Sentencing Factors

A thorough consideration of all the sentencing factors set forth in 18 U.S.C. § 3553(a) suggests that a significant sentence of imprisonment is appropriate in this case. The Supreme Court has declared: "As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark." *Gall v. United States*, 552 U.S. 38, 49 (2007). "These requirements mean that '[i]n the usual sentencing, . . . the judge will use the Guidelines range as the starting point in the analysis and impose a sentence within the range.'" *Peugh v. United States*, 133 S. Ct. 2072, 2083 (2013) (*quoting Freeman v. United States*, 131 S. Ct. 2685, 2692 (2011) (plurality opinion); ellipsis in original). "Common sense indicates that in general, this system will steer district courts to more within-Guidelines sentences. *Peugh*, 133 S. Ct. at 2084. "The federal system adopts procedural measures intended to make the Guidelines the lodestone of sentencing." *Id.*

In addition, the Court must also consider all of the sentencing considerations set forth in § 3553(a).

### B. Application

The relevant § 3553(a) factors will be discussed in turn.

**(1) The nature and circumstances of the offense**

The nature and circumstances of Smith's criminal conduct are extremely serious and troublesome. As discussed throughout this memorandum, Smith played a significant and highly active leadership role in the bribery and fraud scheme. Over the course of two basketball seasons, Smith recruited and attempted to recruit dozens of players on numerous teams to join the scheme. He further encouraged those players to recruit their teammates, and when they agreed to join the scheme, Smith directed the players in their criminal conduct. He then ensured that the players were paid their bribes for successfully fixing the games, often traveling himself to pay the players and further encourage them to continue to engage in the scheme. He engaged in explicit text messaging with the players about the scheme, clearly demonstrating his control over the operation and the extensive nature of his criminal activity. He further engaged with the other leaders of the scheme who were also recruiting players and placing the wagers on these games. The scheme involved millions of dollars in betting and resulted in at least $1.1 million in losses to the financial victims of the scheme.

The corruption and fraud involved in this case did tremendous damage to the integrity of NCAA basketball. Officials from the NCAA provided a written statement signed by Jonathan Duncan, the NCAA's Vice President of Enforcement, addressing the broad impact that this conduct had on college sports—considering the perspectives of the different categories of people involved in college sports, such as the schools, the student athletes, the coaches, and the fans. The statement explains in detail how this conduct undermined the integrity of sports; degraded

the efforts of student athletes who have spent their lives dedicated to their sport; and betrayed the trust of fans who believe the games they watch are decided on the court and not in FaceTime communications where bribery schemes are hatched. For example, Mr. Duncan explained:

> Impacting outcomes of college basketball games causes harm far beyond any single game, bet or financial transaction. When individuals intentionally influence the outcome of a sporting contest for gambling purposes, they undermine the integrity of competition. Student-athletes dedicate countless hours to training, preparation and competition with the expectation that contests will be conducted fairly. Contest manipulation devalues those efforts and unfairly disadvantages every participant who competes within the rules. Authentic competition is central to the student-athlete experience, and competition manipulation undermines the earnest efforts of teammates, coaches, opponents, schools and conferences. These are competitions young people have been preparing most of their lives for and may well be their last athletics opportunity at such a level.
>
> Fans must have confidence that the performances they spend money to attend or watch are conducted fairly and the outcomes are based only on ability. Those ticket and broadcast revenues enable NCAA schools to provide hundreds of thousands of college athletes tremendous benefits, including $4 billion in scholarships, as well as health and wellness support and countless hours of coaching, training, mentoring and development. Should fans question the integrity of the game, this entire system that provides unprecedented benefits to student-athletes is at risk.
>
> …
>
> Perhaps most importantly, conduct involving contest manipulation, such as the conduct involving bribery and game fixing as charged in this case, strikes at public confidence in sport. Fans, media partners, sponsors and the public engage with college sports because they believe competitions are fair, genuine and unscripted. If that confidence is lost, the damage extends beyond a single school or sporting event. The credibility of the broader college athletics system is called into question. The resulting reputational harm can have lasting detrimental effects on all student-athletes and schools, the public's trust in the game, and the college sports ecosystem as a whole.

This was obviously a serious crime involving corruption and fraud that had a substantial impact on the "college sports ecosystem as a whole," calling for significant punishment.

The defendant also committed the crime of possessing a firearm as a convicted felon, and to exacerbate that crime, the semiautomatic gun he illegally possessed was stolen. The

defendant's gun possession is also serious and reflects his proclivity to engage in criminal conduct. Federal law strictly prohibits convicted felons from possessing firearms, with good reason. Gun violence is a problem across America with major cities bearing the heaviest burden. This Court is well aware of the impact that gun crimes have on our community, and how illegally possessed guns contribute substantially to our violent crime problems. By taking that firearm out of the defendant's hands, law enforcement ensured that the defendant's gun would not be used for further criminal activity.

Accordingly, the nature and circumstances of the defendant's criminal conduct call for a sentence at the high end of the guideline range.

**(2) The history and characteristics of the defendant**

The defendant's criminal background speaks volumes about his history and characteristics. He has prior convictions for illegal drug distribution, unauthorized use of a vehicle, and eluding arrest in a motor vehicle. These were all separate offenses that resulted in prison sentences. The eluding arrest offense involved the defendant driving 100 miles per hour and fleeing from the police when they attempted to pull him over. The defendant has a series of additional serious traffic violations, all of which (along with his other illegal conduct) reflect his general unwillingness to follow the rules of society and his lack of concern for others. The defendant has a history of engaging in antisocial conduct.

The length and nature of the defendant's criminal bribery and fraud scheme also reflects poorly on his character. This was not a momentary exercise of poor judgment. The defendant turned his point-shaving scheme into a way of life as he invested an enormous and regular effort

into operating this scheme over multiple years, recruiting and corrupting players to fix the outcome of NCAA basketball games.

The defendant's positive upbringing does not help explain his decision to engage in the current and past criminal behavior. He shared with the Probation Officer that he was raised by "amazing" parents, including his mother who was a high school principal. He reported that he was well cared for and did not experience any mistreatment or abuse. He does not suffer from any serious mental health issues, and his prior drug use was limited to marijuana. PSR ¶¶ 179-202. The defendant should have made better choices. His history and characteristics further support the government's recommended sentence at the higher end of the applicable guideline range.

**(3) The need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; and**

**(4) The need to afford adequate deterrence to criminal conduct, and to protect the public from further crimes of the defendant.**

There is a strong need to impose a sentence that reflects the seriousness of these offenses, promotes respect for the law, and provide just punishment. The defendant's conduct caused significant harm to many victims. The defendant is not an individual who made a singular bad decision; his criminal conduct stretched for years, across multiple players and teams, and impacted many people, schools, and institutions across the country. The sentence here should punish the defendant accordingly.

A prison sentence as recommended by the government would appropriately punish the defendant for operating this wide-ranging fraud and bribery scheme while also committing the serious firearm offense in North Carolina. The recommended sentence would promote respect

for the law and deter others from engaging in this type of activity. The justice system must appropriately punish corruption and fraud, especially when the crimes impact institutions that are important to the public. Crimes like this are difficult to detect, as evidenced by the length of time that the defendant engaged in the crimes here, making it even more essential that the sentence deter those who might engage in this type of criminal activity.

As numerous courts have recognized, fidelity to the guidelines and imposing serious prison sentences serve a particularly important purpose in the area of white-collar crime. For instance, the Supreme Court in *Mistretta v. United States*, 488 U.S. 361, 375 n.9 (1989), noted that the Senate Report on the Sentencing Reform Act "gave specific examples of areas in which prevailing sentences might be too lenient, including the treatment of major white-collar criminals." *Accord United States v. Ebbers*, 458 F.3d 110, 129 (2d Cir. 2006) ("[T]he Guidelines reflect Congress' judgment as to the appropriate national policy for [white-collar] crimes...."); *United States v. Mueffelman*, 470 F.3d 33, 40 (1st Cir. 2006) (noting the importance of "the minimization of discrepancies between white- and blue-collar offenses"). In *United States v. Martin*, the Court of Appeals for the Eleventh Circuit provided the following explanation:

> Our assessment is consistent with the views of the drafters of § 3553. As the legislative history of the adoption of § 3553 demonstrates, Congress viewed deterrence as 'particularly important in the area of white collar crime.' S.Rep. No. 98-225, at 76 (1983), reprinted in 1984 U.S.C.C.A.N. 3182, 3259. Congress was especially concerned that prior to the Sentencing Guidelines, '[m]ajor white collar criminals often [were] sentenced to small fines and little or no imprisonment. Unfortunately, this creates the impression that certain offenses are punishable only by a small fine that can be written off as a cost of doing business.' *Id.*

455 F.3d 1227, 1240 (11th Cir. 2006).

This is especially true here. The sentence imposed must communicate to the defendant and the public that the justice system will not tolerate this type of criminal activity. The sentence must message to the community that individuals who engage in corruption and fraud, as well as firearm offenses, will suffer serious consequences for their criminal behavior. The best way to deter this defendant and others is to send him to prison to serve a significant guideline sentence.

**(5) The need to provide the defendant with educational or vocational training, medical care, or other correctional treatment in the most effective manner.**

There is no need in this case to fashion a sentence that would provide the defendant with educational or vocational training. Thus, this statutory factor should not affect the Court's sentencing determination.

**(6) The need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct.**

While the sentencing guidelines are advisory, they remain the sole means available for assuring some measure of uniformity in sentencing, fulfilling a key Congressional goal in adopting the Sentencing Reform Act of 1984. Reference to the guidelines, while carefully considering the 3553(a) factors particularly relevant to an individual defendant, is the only available means of preventing the disfavored result of basing sentences on the luck of the draw in judicial assignments. The recommended guideline sentence fairly considers this defendant's conduct and the circumstances of his case, and there is no basis to conclude that a sentence at the high end of the guidelines range would result in any unwarranted disparities. He was a leader in the bribery scheme who was instrumental to its success, and he committed a firearms offense as well which resulted in only a minor adjustment to the guidelines. On balance, the government

believes that the defendant's criminal conduct is appropriately captured by a sentence at the higher end of the sentencing guidelines range.

**(7) <u>The need to provide restitution to any victims of the offense.</u>**

This Court need not otherwise fashion a sentence that considers the need for the defendant to pay restitution. Under the terms of the plea agreement, the defendant should be ordered to pay restitution of $1,148,137.41 (jointly and severally liable with Blakeney, Fairley, Hennen, and others), as well as a forfeiture money judgment and forfeiture of the firearm and ammunition, as set forth in the government's forthcoming forfeiture motions.

## V. **CONCLUSION**

For all of the reasons set forth above, and subject to any additional information presented at the hearing and in the Sealed Supplement, the government respectfully requests that the Court impose a sentence at the higher end of the guidelines range of 70 to 87 months in prison, together with restitution of $1,148,137.41 and the forfeiture described above. A sentence near the top of the guidelines range is warranted by the defendant's leadership role in a sophisticated, far-reaching scheme that corrupted college basketball, caused substantial financial losses, and harmed numerous victims, as well as his continued criminal conduct, including his possession of a firearm despite his prior felony drug convictions. Such a sentence appropriately reflects the seriousness of the defendant's offenses, promotes respect for the law, provides just punishment, and serves the important need to deter others from profiting by corrupting institutions and violating the rules on which they depend.

Respectfully submitted,

DAVID METCALF
United States Attorney

*s/ Louis D. Lappen*
LOUIS D. LAPPEN
JEROME M. MAIATICO
Assistant United States Attorneys

**CERTIFICATE OF SERVICE**

I hereby certify that a true and correct copy of the Government's Sentencing Memorandum has been filed on ECF and served via email upon:

Rocco C. Cipparone, Jr., Esq.
157 Bridgeton Pike Suite 200-320
Mullica Hill, NJ 08062
rcipparone@cipparonelaw.com

*/s Louis D. Lappen*
LOUIS D. LAPPEN
Assistant United States Attorney

Date: October 2, 2026