**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| **v.** | : | **CRIMINAL NOS. 26-23 & 26-99** |
| | : | |
| **JALEN SMITH** | : | |

---

**DEFENDANT JALEN SMITH'S SENTENCING MEMORANDUM**

---

On the Memorandum:

*Rocco C. Cipparone, Jr., Esquire*
157 Bridgeton Pike, Suite 200-320
Mullica Hill, NJ 08062
(856) 547-2100
www.Cipparonelaw.com
Attorney for Defendant Jalen Smith

## TABLE OF CONTENTS

**I. Applicable Legal Framework for Sentencing ........ 1**

**II. There Are No Unresolved Non-Guideline Revisions or Other Updates to the PSR ........ 4**

**III. There Are Objections to Guideline Calculations in the Presentence Investigation Report ........ 4**

**IV. The Court Should Grant a Variance From the Advisory Guideline Range Minimum in Order to Impose a Sentence That Is Sufficient But Not Greater Than Necessary to Meet the Purposes of Sentencing Under 18 U.S.C. § 3553 ........ 5**

Nature and Circumstances of the Offense and the History and Characteristics of the Defendant ........ 5

History and Characteristics of the Defendant ........ 6

1. Remorse, Acceptance of Responsibility, and Immediate and Continued Candor Regarding his Conduct ........ 7
2. Mental Health History ........ 8
3. Gambling History ........ 9
4. Substance Abuse: Persistent, Largely Untreated Marijuana Use ........ 9
5. Character and Reputation ........ 10
6. Education ........ 13
7. Employment ........ 14
8. Family Life ........ 14
9. Criminal History, Low Risk of Recidivism, and Impact of Sentence Type on Recidivism ........ 15

Deterrence and Punishment ........ 15

The Kinds of Sentences Available and the Sentencing Range ........ 16

Pertinent Policy Statements Issued by the Sentencing Commission ........ 16

The Need to Avoid Unwarranted Sentencing Disparity Among Defendants with Similar Records Who Have Been Found Guilty of Similar Conduct ........ 17

The Need to Provide Restitution to Any Victims of the Offense ........ 19

**V. Response to the Government's Sentencing Memorandum ........ 20**

A. Mr. Smith Had No Role in the CBA Scheme ........ 20

B. The Applicable Guideline Finding Is Manager/Supervisor, Not Organizer/Leader, and the Government's Repeated "Leader" Characterization Should Be Read Accordingly ........ 21

C. Mr. Smith's Mental Health History Should Not Be Dismissed as Insignificant ........ 21

D. The Government's Request for a High-End Sentence Does Not Adequately Account for Mr. Smith's Conciliation ........ 22

E. Mr. Smith is not a "Repeat Drug Trafficker" ........ 22

**VI. Conclusion ........ 23**

## I. APPLICABLE LEGAL FRAMEWORK FOR SENTENCING

The advisory sentencing guidelines are now just one of several factors which the Court must consider at sentencing pursuant to the guiding principles in *United States v. Booker*, 543 U.S. 220 (2005), and 18 U.S.C. § 3553. As is well established, the Court should impose a sentence that is reasonable and "sufficient but not greater than necessary" to achieve the purposes of sentencing, even if such a sentence is lower than the **advisory** sentencing guideline range. 18 U.S.C. § 3553(a). The Supreme Court has made clear that if a sentencing court reasonably determines (and explains its basis) that a sentence even significantly different from the advisory guideline range is appropriate, the disparity from the guideline range is of no moment: the discretion to impose such a sentence will not be disturbed on appeal unless it was an abuse of discretion by the district court. *Gall v. United States*, 552 U.S. 38 (2007):

> We now hold that, while the extent of the difference between a particular sentence and the recommended Guidelines range is surely relevant, courts of appeals must review all sentences—whether inside, just outside, or significantly outside the Guidelines range—under a deferential abuse-of-discretion standard. . . .
>
> As a result of our decision, the Guidelines are now advisory, and appellate review of sentencing decisions is limited to determining whether they are "reasonable." Our explanation of "reasonableness" review in the *Booker* opinion made it pellucidly clear that the familiar abuse-of-discretion standard of review now applies to appellate review of sentencing decisions.
>
> *Gall*, 552 U.S. at 41, 46.

Effective November 1, 2025, the United States Sentencing Guidelines were amended to remove departures and policy statements relating to specific personal characteristics. *See* USSG App. C, amend. 836. That change was made "to better align the requirements placed on the court and acknowledge the growing shift away from the use of departures provided for within the Guidelines Manual in the wake of *Booker* and subsequent decisions. . . . [However,] [t]he

removal of departures from the Guidelines Manual does not limit the information courts may consider in imposing a sentence nor does it reflect a view from the Commission that such facts should no longer inform a court for purposes of determining the appropriate sentence." USSG Manual, Pt. A — Introduction and Authority. Consequently, the factors that previously supported downward departures may still be considered by the sentencing court in formulating a sentence under 18 U.S.C. § 3553(a), including within or below the advisory guideline range by means of a variance. As the United States Court of Appeals for the Third Circuit has stated, the sentencing court should exercise its discretion by considering the relevant 18 U.S.C. § 3553(a) factors in determining the sentence, regardless whether it varies from the guideline advisory range. *United States v. Handerhan*, 739 F.3d 114, 120 (3d Cir. 2014); *United States v. Ali*, 508 F.3d 136, 142 (3d Cir. 2007) (citing *United States v. Gunter*, 462 F.3d 237, 247 (3d Cir. 2006); *United States v. King*, 454 F.3d 187, 196 (3d Cir. 2006); *United States v. Cooper*, 437 F.3d 324, 330 (3d Cir. 2006)).

Courts should not adopt a reflexive or presumptive acceptance of the guideline range. The appellate standard of review for sentencing decisions is "reasonableness." *Booker*, 543 U.S. at 261–62; *United States v. Grier*, 475 F.3d 556, 561 (3d Cir. 2007); *Cooper*, 437 F.3d at 329–331. "[A] within-guidelines sentence is not necessarily reasonable *per se*. Otherwise . . . we would come close to restoring the mandatory nature of the guidelines excised in *Booker*." *Cooper*, 437 F.3d at 331. The sentencing court expressly must consider and weigh all the relevant statutory factors set forth in 18 U.S.C. § 3553(a) and exercise its independent judgment to determine the appropriate sentence, whether within or outside the advisory sentencing guideline range. *Grier*, 475 F.3d at 571–72; *see also Cooper*, 437 F.3d at 329; *United States v. Vampire Nation*, 451 F.3d 189, 196 (3d Cir. 2006).

The factors which the sentencing court must consider pursuant to 18 U.S.C. § 3553(a) are:

> **(1)** the nature and circumstances of the offense and the history and characteristics of the defendant;
>
> **(2)** the need for the sentence imposed—(A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; (C) to protect the public from further crimes of the defendant; and (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;
>
> **(3)** the kinds of sentences available;
>
> **(4)** the kinds of sentence and the sentencing range established . . . ;
>
> **(5)** any pertinent policy statement . . . ;
>
> **(6)** the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and
>
> **(7)** the need to provide restitution to any victims of the offense.

18 U.S.C. § 3553(a); *see also Grier*, 475 F.3d at 571 n.10.

Considering *Booker* and its progeny, a sentencing court also may engage in a variance from the advisory sentencing guideline range based on factors that would not otherwise be a sufficient or even a permissible basis for departure under the advisory guidelines:

> 'a guidelines departure prohibition does not preclude the district court from considering that factor when the issue is a variance under *Booker*.' *United States v. Gatewood*, 438 F.3d 894, 897 (8th Cir. 2006); *see also, e.g., United States v. Lake*, 419 F.3d 111, 114 (2d Cir. 2005) (commenting that "absent the strictures of the Guidelines, counsel would have had the opportunity to urge consideration of circumstances that were prohibited as grounds for a departure" under § 5K2.0(d)); *United States v. Milne*, 384 F. Supp. 2d 1309, 1312 (E.D. Wis. 2005) (holding that post-*Booker*, "courts may grant additional consideration to defendants who demonstrate acceptance beyond that necessary to obtain a two or three level reduction under § 3E1.1" because "such conduct bears directly on their character, § 3553(a)(1), and on how severe a sentence is necessary to provide deterrence and punishment, § 3553(a)(2)").

*United States v. Severino*, 454 F.3d 206, 211 (3d Cir. 2006); *see also Vampire Nation*, 451 F.3d at 195–96 (delineating the difference between a variance and a departure).

## II. THERE ARE NO UNRESOLVED NON-GUIDELINE REVISIONS OR OTHER UPDATES TO THE PSR

The defendant has no unresolved objections to the non-guideline portions of the Final Presentence Investigation Report ("PSR"). The single objection raised during the presentence process to language in footnote 2 to PSR ¶ 53 characterizing the scope of unidentified wagers as "likely higher" than the bets the government was able to identify was addressed in the Addendum to the Presentence Report. The government has confirmed that it is not seeking any additional punishment or consequence arising from that footnote, and Mr. Smith does not pursue the objection further in this memorandum other than to state that the Court should not consider the statement in the footnote in fashioning its sentence for the reasons stated in the addendum to the PSR.

## III. OBJECTIONS TO GUIDELINE CALCULATIONS IN THE PRESENTENCE INVESTIGATION REPORT

Mr. Smith does not object to the guideline calculations set forth in the Final PSR. As calculated therein, the adjusted offense level for Group I (bribery, conspiracy to commit wire fraud, and wire fraud) is 28 (PSR ¶ 135). The adjusted offense level for Group II (possession of a firearm by a felon) is 22 (PSR ¶ 141). The combined adjusted offense level after the multiple-count adjustment is 29 (PSR ¶ 145). After a three-level reduction for acceptance of responsibility under USSG § 3E1.1(a) and (b), the total offense level is 26. PSR ¶¶ 147–149. The criminal history category is II (PSR ¶ 157). Therefore, the undisputed advisory guideline imprisonment range is 70 to 87 months. PSR ¶ 219.

## IV. THE COURT SHOULD GRANT A VARIANCE FROM THE ADVISORY GUIDELINE RANGE MINIMUM IN ORDER TO IMPOSE A SENTENCE THAT IS SUFFICIENT BUT NOT GREATER THAN NECESSARY TO MEET THE PURPOSES OF SENTENCING UNDER 18 U.S.C. § 3553

In Mr. Smith's situation, weighing the relevant sentencing criteria favors a sentence well below the guideline range. It respectfully is submitted that **a substantial downward variance** from the advisory guideline range of 70 to 87 months would be sufficient but not greater than necessary in the circumstances of Mr. Smith and this case. The lasting stigma and collateral consequences of this federal felony conviction, along with a substantial downward varied sentence of imprisonment for the reasons set forth herein and in any sealed supplement, will provide more than sufficient general and specific deterrence in the attendant circumstances.

Analysis and application of the salient factors under 18 U.S.C. § 3553(a) makes clear that a substantial downward variance from the advisory guideline range is sufficient but not greater than necessary in the circumstances of this defendant and this case. A within-guideline sentence would be greater than necessary to meet the purposes of sentencing.

The salient sentencing factors are discussed below.

### <u>Nature and Circumstances of the Offense and the History and Characteristics of the Defendant</u>

The nature and circumstances of the offense are serious, and Mr. Smith does not minimize them. He was recruited into, and played an active role in, a multi-season point-shaving scheme affecting NCAA Division I men's basketball games. PSR ¶¶ 59–110. He has accepted responsibility for that conduct fully. But the § 3553(a)(1) inquiry is not one-sided, and the balance of the record, including Mr. Smith's cooperativeness in resolving two separate federal matters in a single forum, his candor with investigators from the earliest point of contact without requesting counsel, his family support and employment, and the untreated mental health and

substance use history discussed below, places this case outside the heartland of cases warranting a sentence at or even near the top of the advisory range which the government has requested.

It bears emphasis at the outset that although the government repeatedly describes Mr. Smith as a "leader" of the scheme, Gov't Mem. at 1, 25, 30, the Probation Office in applying the guidelines directly to the evidence considered and rejected a four-level organizer/leader enhancement under USSG § 3B1.1(a), explaining that "Smith was not the originator of the scheme and was recruited by Fairley, Hennen, and Blakeney." PSR ¶ 133 n.18. The three-level adjustment that does apply is for a manager or supervisor, not an organizer or leader. USSG § 3B1.1(b); PSR ¶ 133. That distinction is addressed further in Part V below, but it is relevant to the Court's individualized assessment of Mr. Smith's relative culpability under § 3553(a)(1) from the outset.

## **History and Characteristics of the Defendant**

### 1. Remorse, Acceptance of Responsibility, and Immediate and Continued Candor Regarding his Conduct

Mr. Smith's acceptance of responsibility began at the earliest possible point of contact with law enforcement. When FBI agents executed a search warrant at his residence on May 21, 2025, Mr. Smith directed them to the specific bedroom in which the firearm at issue in Docket No. 26CR00099-001 was located, PSR ¶ 112, and he voluntarily agreed to be interviewed. PSR ¶ 113. During that interview, Mr. Smith admitted that the firearm belonged to him and explained the circumstances of his acquisition of it. PSR ¶ 113. The government's sentencing memorandum confirms that, at that same interview, Mr. Smith also "consented to a voluntary interview about th[e] [bribery, fraud, and point-shaving] scheme with FBI agents" and "confessed to the criminal activity." Gov't Mem. at 20. Mr. Smith did not ask to consult with an attorney before this interview.

Mr. Smith continued that early and full acceptance of responsibility by pleading guilty, and by his acceptance of responsibility to the Probation Office in connection with the preparation of the PSR. PSR ¶ 121.

Beyond accepting responsibility for the NCAA bribery and fraud scheme, Mr. Smith did something considerably more: he agreed to resolve an entirely separate firearms offense that occurred in the Western District of North Carolina (Charlotte, North Carolina) by waiving prosecution by indictment and waiving venue so that it could be consolidated and resolved together with the bribery and fraud case in this District. PSR ¶¶ 4–5, 8. Mr. Smith expressly acknowledged his right under Federal Rule of Criminal Procedure 18 to be prosecuted in the district where that offense occurred, and he agreed not to challenge or contest venue in the district court, on appeal, or in any post-conviction proceeding. PSR ¶ 8.

By agreeing to accept prosecution of the firearm offense in the Eastern District of Pennsylvania rather than insisting on his right to be prosecuted in the Western District of North Carolina, Mr. Smith spared the government and a second district court the burden, expense, and delay of initiating and litigating a wholly separate federal prosecution in another district. The venue waiver, however, extends well beyond what is ordinarily required to earn the one-level additional reduction under § 3E1.1(b): it resolved a second, independently chargeable matter in an entirely different district, without the need for a second indictment, a second set of pretrial proceedings, or a second prosecution team.

Furthermore, rather than litigating the amount of forfeiture applicable to him, Mr. Smith reached agreement with the government on that matter as well.

The level of Mr. Smith's acceptance of responsibility in this case, taken as a whole, constitutes more than the standard acceptance of responsibility and warrants additional mitigation by way of variance.

**2. Mental Health History**

Mr. Smith was diagnosed as a child with attention-deficit hyperactivity disorder ("ADHD") and oppositional defiant disorder ("ODD"). PSR ¶¶ 186, 197. His mother reported that the diagnoses were made in the fourth grade, PSR ¶ 186, while Mr. Smith recalled the diagnosis as occurring in middle school, PSR ¶ 197. In either event, these were not transient childhood labels but conditions identified early and never meaningfully addressed. Mr. Smith was prescribed Adderall by his pediatrician, not any psychiatrist or mental health specialist, and took the medication on and off through his freshman year of college. PSR ¶¶ 186, 197. He is not currently prescribed any medication for these conditions. PSR ¶ 197. Unfortunately, that was the extent of Mr. Smith's "treatment" for those conditions. Mr. Smith "has never participated in mental health counseling or treatment." PSR ¶ 197. His mother confirmed the same, explaining that she "denied that he ever participated in therapy or counseling as a result of his diagnosed mental health conditions". PSR ¶ 186. In other words, for more than two decades, a child diagnosed with both ADHD and ODD received minimal medication management from a pediatrician and nothing else: no behavioral therapy, no counseling, no psychiatric follow-up of any kind. That history is relevant to the Court's § 3553(a)(1) assessment of Mr. Smith's history and characteristics, and it bears on the § 3553(a)(2)(D) need to provide the defendant with medical care or other correctional treatment in the most effective manner, including as a condition of any term of supervised release.

### 3. Gambling History

When asked by the Probation Office about a history of gambling, Mr. Smith stated, "not anymore," and explained that he had previously engaged in sports betting for approximately one year, frequenting casinos roughly twice monthly and typically "break[ing] even." He denied any period of problematic gambling. PSR ¶ 198. Considered together with Mr. Smith's otherwise undiagnosed and untreated ADHD and ODD, discussed *supra*, this history supports a more individualized view of Mr. Smith's relationship to gambling and the offense conduct than the "not problematic" self-report alone suggests, and counsel respectfully submits it as a basis, among others, for the requested variance.

### 4. Substance Abuse: Persistent, Largely Untreated Marijuana Use

Mr. Smith began smoking marijuana at approximately age 19 and, by his own account, used the drug daily during periods in college and approximately twice weekly more recently. PSR ¶ 199. He submitted urine specimens that tested positive for marijuana on March 9, 2026, March 31, 2026, June 30, 2026, and July 16, 2026, while on pretrial release. PSR ¶¶ 16, 199.

The record reflects four separate clinical assessments of Mr. Smith's marijuana use over more than a decade, and only one meaningful course of treatment, which was not successfully completed. In 2014, following a drug-related arrest, Mr. Smith was assessed and diagnosed with cannabis abuse and recommended for a short-term treatment program. It is unclear whether he completed it. PSR ¶ 200. In 2018, following another referral, he was diagnosed with cannabis use disorder and began a treatment program on June 18, 2018. According to the discharge summary, he was "inconsistent in attendance," ultimately completed the required sessions, but then "refused required [urine specimens] and [left the building] on [the] last day," after which further attempts to contact him failed. His "treatment status remain[ed] incomplete." PSR ¶ 201.

By contrast, the two most recent assessments -- in September 2023 and again in July 2026 (the latter through Pretrial Services) -- concluded that Mr. Smith did not meet the medical-necessity criteria for a diagnosable substance use disorder at that time and that treatment was not clinically indicated. PSR ¶¶ 202–203.

Taken as a whole the record reflects a pattern of marijuana use that began in Mr. Smith's late teens and has continued, with varying intensity, for more than a decade, interrupted by a single incomplete treatment episode nearly eight years ago and never otherwise meaningfully addressed. While the two most recent assessments did not find a diagnosable disorder warranting treatment at those points in time, neither assessment altered the underlying pattern of continued use. PSR ¶ 199. That persistent, never-successfully-treated use arising in a young man whose childhood ADHD and ODD were themselves never treated beyond pediatric medication, is properly considered under § 3553(a)(1) and bears on the § 3553(a)(2)(D) need for treatment in the most effective manner and should be considered also in connection with the downward variance requested.

**5. Character and Reputation**

Eleven letters submitted from a range of independent vantage points including educators, coaches, a family friend of decades, and family members corroborate the same picture of Mr. Smith that emerges from the PSR itself. He is a man whose community involvement, family devotion, and basic character stand apart from the offense conduct. Three themes recur throughout the letters, which are contained in the Appendix hereto.

**Youth mentorship and community service.** Several letters[1], from individuals who know Mr. Smith in entirely different contexts, independently describe the same pattern of unpaid community service through basketball and academics. Andre Brown, a health and physical education teacher and athletic director who has known Mr. Smith for over fifteen years, recounts that Mr. Smith "instantly made positive connections with the scholars, athletes, and staff" at Ashley Park Pre K-8 School and "continued to support our athletic program by working hands on with aspiring basketball players who respected his positive energy and direct coaching." A.001 (Brown letter). Educators Bryant Clifton and Tanya Filmore separately describe Mr. Smith's service as a referee for both basketball and baseball and as a coach of a boys' AAU basketball team, and that he took "on the responsibility of teaching not only the fundamentals of the game, but also important life lessons such as teamwork, discipline, respect, responsibility, and accountability." A.002 (Clifton letter); A.004 (Filmore letter) (nearly identical language). Both letters also describe Mr. Smith's volunteer work tutoring students in mathematics. A.002 (Clifton letter); A.010 (Polk letter). Robin Dawkins, a family friend who has known Mr. Smith since birth, confirms that he "referees basketball games, coaches basketball, and tutors both basketball players and coaches without charging them," and that he "helped financially sponsor community sporting events for youth." A.003 (Dawkins letter). Yolanda Polk likewise describes Mr. Smith as "passionate about coaching and training athletes" with "a unique ability to bring out the very best in every athlete he trains." A.009–A.010 (Polk letter). While of course the same community that he helps and loved – the sports community – was affected negatively by his conduct which is the subject of his conviction, his positive contributions to that community over

---

[1] The letters have been redacted of the email addresses and telephone numbers of the authors for privacy, but will be provided unredacted to the Court if the Court prefers same.

a sustained period of time should not be minimized or ignored in fashioning the appropriate sentence.

**Family devotion.** Mr. Smith's sister-in-law, Katrina Hudson, devotes her letter to his role in raising her children (Mr. Smith's niece and nephews). Ms. Hudson describes Mr. Smith as someone who "regularly spends time with them [her children], helps them with their homework, and makes sure they have the support and encouragement they need to be successful," who "takes the initiative to practice sports with them outside of their scheduled activities," and who "willingly helps with everyday responsibilities and never hesitates to pitch in when something needs to be done." A.005–A.006 (Hudson letter). She describes "the consistency of his character" as "dependable, compassionate, responsible, and willing to put the needs of others before his own." A.006 (Hudson letter). Ms. Dawkins similarly writes that "[w]hat stands out most . . . about Jalen is his heart. I have personally witnessed him give to others and help people without looking for anything in return." A.003 (Dawkins letter). Ms. Polk confirms that Mr. Smith was "raised in a supportive and nurturing home" and remains "surrounded by positive influences, including a devoted sibling . . . and the village who offers encouragement and support." A.009 (Polk letter).

**Character distinct from the offense conduct.** Notably, several letters address the pending charges directly, candidly, and without minimizing them, which lends the letters additional credibility. Ms. Hudson states plainly: "I understand the seriousness of the circumstances that have brought him before the Court, and I do not intend to minimize or excuse those circumstances." A.005 (Hudson letter). Ms. Dawkins writes: "I understand that Jalen is before the Court on serious charges. I do not know the facts the Court must decide, and I would not presume to speak to them. I can speak only to the young man I have known." A.003

(Dawkins letter). Sonya McKelvey-Whitener, a former educator who tutored Mr. Smith in mathematics during his middle school years and has known him for nearly two decades, writes: "I am fully aware of the legal situation that Jalen is currently facing. While I understand the seriousness of these proceedings, I can state with absolute certainty that this situation is completely out of character for him. It does not define the responsible, resilient man I have watched him become." A.007 (McKelvey-Whitener letter). Otisquest Posey, a longtime family acquaintance, writes: "Like many young people, he has faced challenges and made mistakes along the way. However, I have seen firsthand his ability to learn from difficult experiences, accept responsibility, and strive to make better decisions. His actions do not define the person I have come to know." A.011 (Posey letter). Ms. Polk, acknowledging that "he is not perfect," asks the Court to "consider Jalen's strong support system, his demonstrated character, and his willingness to learn and grow from this experience." A.009–A.010 (Polk letter).

**6. Education**

Mr. Smith graduated from North Mecklenburg High School in Huntersville, North Carolina, in June 2013. PSR ¶ 204. He thereafter enrolled at Virginia State University, where he studied accounting and, in one semester, achieved a 4.00 grade point average over 16 credit hours, before his enrollment ended in connection with a drug-related arrest. PSR ¶¶ 205; PSR ¶ 205 n.27 (describing the underlying arrest). He later enrolled at Appalachian State University, studying business management and completing 43 credit hours with a 2.13 cumulative GPA, before his enrollment there also ended following a 2017 arrest. PSR ¶ 206. Although Mr. Smith did not complete a degree, the record and particularly his early academic performance at Virginia State reflects genuine ability that was derailed by the same untreated ADHD, ODD, and substance use history discussed above.

**7. Employment**

Mr. Smith is presently employed, full time, as the day-to-day manager for a 21-year-old professional basketball player who currently plays for the Chicago Bulls. PSR ¶ 209. He began that position on January 7, 2026, and remains in good standing. PSR ¶ 209. His employer, Rico Grier, the founding partner of XOVR Sports, confirmed to the Probation Office that Mr. Smith works approximately 35 hours per week managing the athlete's on- and off-court preparation, travel, and day-to-day affairs, and that the company is "aware of Mr. Smith's supervision requirements and . . . prepared to accommodate his schedule for reporting obligations, court appearances, and any other conditions of his supervision." PSR ¶ 209. Before this position, Mr. Smith worked for approximately three years as a basketball referee officiating high school and recreational league games in North Carolina, and he was separately active for several years in training and developing basketball players for professional scouting combines. PSR ¶¶ 210–211. Mr. Smith has been and will after release from incarceration continue to be a productive member of society.

**8. Family Life**

Mr. Smith was raised primarily by his mother with regular visitation with his father. PSR ¶¶ 179, 185. Mr. Smith described his parents as "amazing" and reported maintaining daily contact with both. PSR ¶ 179. He is "very close" with his brother, PSR ¶ 180, and also shares a close bond with his maternal grandmother, whom his mother described as "his heart." PSR ¶ 189.

His mother's statement to the Probation Office speaks directly to Mr. Smith's character apart from the offense conduct: "Jalen is very passionate about basketball…about his family. He's always willing to help and he basically cares about people's feelings. He wants to help

people be successful. He's always been a giver." PSR ¶ 189. She further confirmed Mr. Smith's remorse: "I know that this situation that he's in — I know it weighs on him . . . I know he's remorseful about it," while noting that "he wasn't brought up in that environment at all. He's had a two-parent home always." PSR ¶ 190. This is corroborated throughout the Defendant's Appendix, discussed further below. *See* Part IV.B.5, *infra*.

### 9. Criminal History, Low Risk of Recidivism, and Impact of Sentence Type on Recidivism

Mr. Smith's criminal history score of three places him in Criminal History Category II, the second-lowest of six categories. PSR ¶¶ 155, 157. None of the convictions comprising that score involved violence: the three scored convictions are a 2018 drug disposition (6 to 17 months, suspended, with probation), an unauthorized-use-of-a-vehicle disposition resolved by *Alford* plea, and an eluding-arrest disposition, each arising between 2017 and 2021 and each resolved by a sentence of probation rather than incarceration. PSR ¶¶ 151, 153–154. The predicate felony drug conviction underlying the firearm offense's base offense level is now more than eight years old. PSR ¶ 151.

## <u>Deterrence and Punishment</u>

The attendant purposes of sentencing would be met by a substantial downward variance.

### a. Specific and General Deterrence

The need — or, more importantly, the lack of need — for specific deterrence is addressed by reference to the immediately preceding sections of this memorandum, which detail Mr. Smith's early and extraordinary cooperation, his stable employment, his family support, and his comparatively low-risk criminal history category.

General deterrence must be viewed in context. Here, Mr. Smith's personal history, and the picture of him that emerges overall, makes clear that general deterrence still would be served by a substantial downward variance. Any sentence of incarceration, a lifelong non-expungable federal felony convictions, the forfeiture ordered, and the other collateral consequences attending such, all will provide adequate deterrence to similarly situated persons even with a downward variance. The many factors that support this conclusion are presented in detail *supra* and in the Defendant's Appendix.

Those "distinguishing characteristics render … [any] ultimate disparity from the Guidelines reasonably warranted. . . ." *United States v. Howe*, 543 F.3d 128, 140 (3d Cir. 2008).

**b. Punishment**

The need for punishment still would be met by a substantial downward variance, for the same reasons discussed in the immediately preceding subsection regarding specific and general deterrence.

**<u>The Kinds of Sentences Available and the Sentencing Range</u>**

The sentence urged here is within the range of sentences available to the Court in this case. As set forth above, the applicable total offense level is 26 and the criminal history category is II, yielding an advisory guideline range of 70 to 87 months. PSR ¶¶ 149, 157, 219. Variances are of course permitted.

**<u>Pertinent Policy Statements Issued by the Sentencing Commission</u>**

No particularly pertinent policy statement has been identified beyond those already discussed in Part I above regarding the November 2025 guideline amendments.

**The Need to Avoid Unwarranted Sentencing Disparity Among Defendants with Similar Records Who Have Been Found Guilty of Similar Conduct**

Each case and defendant is an individual consideration, and considering all the foregoing factors, a substantial downward variance would not create any unwarranted sentencing disparity from others convicted of similar offenses.

The following comparisons are offered. As of the writing of this memorandum, counsel is not aware that any co-defendant in this very case has been sentenced. However, useful points of comparison are other federal prosecutions of bribery schemes negatively impacting college sports including NCAA basketball. In each instance identified, the defendant who occupied the top organizational role in the scheme (clearly a more culpable position than the manager/supervisor role the PSR attributes to Mr. Smith) received a sentence at (in one instance) or well below the bottom of Mr. Smith's 70-to-87-month advisory range.

In *United States v. Ghazi Manni*, No. 2:14-cr-20749 (E.D. Mich.), as the DOJ press release states, the principal force behind two separate sports-fixing schemes (and other crimes) was sentenced to 70 months imprisonment:

> U.S. District Judge Mark Goldsmith sentenced Ghazi Manni, 58, to 70 months in prison, three years of supervised release, and ordered him to pay restitution of $700,000 and to forfeit $700,000 to the government.
>
> According to court records, between December 2005 and December 2006, Manni … paid money to a professional jockey to influence the results of races at Tampa Bay Downs in Tampa, Florida, and elsewhere [and]… then used the simulcast pari-mutuel wagering system to place bets on the fixed races. Manni [also] pleaded guilty to paying University of Toledo athletes to affect the point spread of football and basketball games in 2005 and 2006. He also pleaded guilty to paying a jockey to fix horse races at a racetrack in Florida from 2004 to 2006. He also pleaded guilty to paying cash for food stamps at King Cole Foods in 2010 and 2011. Manni had been previously convicted by a jury of unlawfully possessing a gun and ammunition … .

A.021 (DOJ Press Release, also available at https://www.justice.gov/usao-edmi/pr/sterling-heights-man-sentenced-sports-bribery). Manni's conduct as the primary actor and in multiple schemes clearly was more significant in role than that of Mr. Smith. His sentence equaled the bottom of Mr. Smith's range.

In the 1990s Arizona State University point-shaving scandal, Benny Silman, who bribed players to shave points, and who was described in contemporaneous press accounts as the scheme's organizer and "mastermind", was sentenced to 46 months' imprisonment. A.023 (*ASU Point-Shaving Leader Sentenced*, CBS News, also available at https://www.cbsnews.com/news/asu-point-shaving-leader-sentenced/). Even as the acknowledged leader of that scheme, Mr. Silman received a sentence nearly two years below the low end of the range the government asks this Court to exceed for Mr. Smith.

In *United States v. Evans*, No. 1:17-cr-00684 (S.D.N.Y.), defendants Emanuel Richardson and Lamont Evans were each sentenced to three months imprisonment and Anthony Bland to probation for accepting cash bribes from athlete advisers in exchange for using their influence over the student-athletes they coached to retain the services of the advisers paying the bribes. A.018 (DOJ Press Release, also available at https://www.justice.gov/usao-sdny/pr/division-i-men-s-college-basketball-coaches-sentenced-their-roles-bribery-scheme).

In related proceedings, Christian Dawkins received twelve months and one day imprisonment and Merl Code received three months imprisonment after having been found guilty in May 2019 of engaging in a scheme to bribe multiple NCAA Division I men's college basketball coaches. A.015 (DOJ Press Release, also available at https://www.justice.gov/usao-sdny/pr/aspiring-manager-and-former-adidas-consultant-sentenced-prison-terms-bribing-ncaa).

In *United States v. Gatto et al*., No. 1:17-cr-00686 (S.D.N.Y.), defendant Gatto was sentenced to nine months in prison, former Adidas consultant defendant Code was sentenced six months in prison, and sports business manager defendant Dawkins (also sentenced in another case as above) was sentenced to six months in prison, after having been found guilty **after trial** by a federal jury of wire fraud and wire fraud conspiracy charges. Those defendants "brokered and facilitated payments funded by Adidas to the families of high school and college-aged basketball players in connection with decisions by those players to commit to Adidas-sponsored schools and a promise that the players also would retain the services of DAWKINS and sign lucrative endorsement deals with Adidas upon turning professional. The payments, which the defendants took great lengths to conceal from the victim-universities, served to defraud the relevant universities … ." A.012 (DOJ Press Release, also available at https://www.justice.gov/usao-sdny/pr/former-adidas-executive-former-adidas-consultant-and-aspiring-manager-all-sentenced).

Of course, no comparator is perfect, but the comparators illustrate that federal courts have not treated comparable point-shaving conduct, including by defendants in more culpable organizer or driving-force roles than Mr. Smith occupied here, as requiring a sentence at or near the top of a range like the one calculated in this case and urged by the government in its sentencing memorandum. A substantial downward variance for Mr. Smith accordingly would not create an unwarranted disparity. If anything, a sentence at the high end of the range, as the government requests, would create disparity in the opposite direction.

**The Need to Provide Restitution to Any Victims of the Offense**

Restitution in the amount of $1,148,137.41 is mandatory under the Mandatory Victim Restitution Act of 1996 as to Docket No. 26CR00023-001, to be paid jointly and severally

among Mr. Smith and his co-defendants. PSR ¶¶ 116–117, 231–232. Mr. Smith does not contest the restitution obligation. His financial circumstances, however, are relevant to the schedule and manner of any payment. His net worth is $1,240.18; his sole income is $750.00 per month; and his housing and daily living expenses are currently covered by his employer. PSR ¶¶ 213–214. The Probation Office has independently concluded that Mr. Smith lacks the present ability to pay a fine within the guideline range. PSR ¶ 216. Mr. Smith respectfully requests that any restitution payment plan during supervised release account for this financial reality, and during incarceration to proceed through the Bureau of Prisons Inmate Financial Responsibility Program.

## V. RESPONSE TO THE GOVERNMENT'S SENTENCING MEMORANDUM

To the extent the government's sentencing memorandum requests a sentence at the higher end of the advisory guideline range, Mr. Smith respectfully submits that the following points, in addition to those already set forth above, counsel against that request.

### A. <u>Mr. Smith Had No Role in the CBA Scheme</u>

The government's memorandum confirms what the PSR independently establishes: Mr. Smith had no role whatsoever in the Chinese Basketball Association ("CBA") point-shaving scheme that both the PSR and the government describe as the origin of the broader scheme. The CBA phase operated during the 2022–2023 season and involved only Antonio Blakeney, Marves Fairley, and Shane Hennen. PSR ¶¶ 51–52; Gov't Mem. at 3 ("The fixers involved in this CBA aspect of the scheme included Antonio Blakeney, Marves Fairley, and Shane Hennen."). It was only "after profiting on the fixed CBA games" that "the fixers turned their attention to NCAA men's basketball games" and, in doing so, "expanded the group of individuals" involved to include, among others, Mr. Smith. PSR ¶ 53; *accord* Gov't Mem. at 3–4 (identically describing the CBA-to-NCAA transition and Mr. Smith's addition to the group only at the NCAA stage).

Mr. Smith's conduct, still serious, was confined to the NCAA phase of the scheme. He did not participate in, benefited from, or had any knowledge of the earlier CBA scheme. The Court should sentence Mr. Smith for the conduct in which he participated, and should not permit the broader, multi-phase scope of the overall investigation to be attributed to him.

### B. The Applicable Guideline Finding Is Manager/Supervisor, Not Organizer/Leader, and the Government's Repeated "Leader" Characterization Should Be Read Accordingly

The government's memorandum repeatedly describes Mr. Smith as "one of the leaders," Gov't Mem. at 1, and states that he "had a leadership role in the scheme," *id.* at 6. The three-level enhancement that was applied is for a manager or supervisor under § 3B1.1(b), which is materially different, and a lesser, finding than organizer or leader. PSR ¶ 133. The government's guideline calculation in its memorandum agrees with this computation. Gov't Mem. at 23 ("the defendant was a manager or supervisor (but not an organizer or leader)"). The Court should weigh the government's rhetorical characterization of Mr. Smith as among the scheme's "leaders" against the fact that he was not an originator of the offense. He was himself recruited into an already-operating scheme rather than having originated it.

### C. Mr. Smith's Mental Health History Should Not Be Dismissed as Insignificant

The government asserts that Mr. Smith "does not suffer from any serious mental health issues". Gov't Mem. at 28. That characterization overlooks the substance of the very paragraphs it cites. PSR ¶ 186 and ¶ 197 document that Mr. Smith was diagnosed in childhood with both ADHD and ODD, was managed solely by pediatric medication rather than any mental health specialist, and "has never participated in mental health counseling or treatment." PSR ¶ 197. Whether or not those diagnoses rise to the level of "serious" mental illness in the acute sense the government's phrasing implies, a lifelong, undiagnosed-in-practice, and entirely untreated

neurodevelopmental and behavioral history is squarely relevant to the § 3553(a)(1) history-and-characteristics inquiry and to the § 3553(a)(2)(D) need for correctional treatment going forward. The government's characterization should not foreclose the Court's consideration of this history.

### D. <u>The Government's Request for a High-End Sentence Does Not Adequately Account for Mr. Smith's Conciliation</u>

The government's guideline computation credits Mr. Smith with the full three-level reduction for acceptance of responsibility, including the additional one-level reduction under USSG § 3E1.1(b) for timely notifying the government of his intent to plead guilty and thereby allowing the government and the Court to allocate resources efficiently. Gov't Mem. at 24; PSR ¶¶ 147–148. Yet the government's request for a sentence at the top of the resulting range, Gov't Mem. at 2, 32, does not account for the full scope of that acceptance of responsibility, including Mr. Smith's uncounseled and immediate interview with the FBI, and his waiver of venue and agreement to resolve the North Carolina firearm charge in this District before it was even the subject of a filed charge anywhere, discussed in Part IV.B.1 above. Furthermore, rather than litigating the amount of forfeiture applicable to him, Mr. Smith reached agreement with the government on that matter as well.

His actions in that regard went beyond what was necessary to earn the guideline reduction the government does not dispute, and it is difficult to reconcile with a recommendation at the very top of the range.

### E. <u>Mr. Smith is not a "Repeat Drug Trafficker"</u>

The government describes Mr. Smith as "a repeat drug trafficker." Gov't Mem. at 2. That is an incorrect statement. Mr. Smith has one prior conviction for 2017 conduct of possession with intent to deliver marijuana for which he was convicted on January 8, 2018 and received a

suspended sentence of 6 to 17 months and a term of probation. PSR ¶ 151. That disposition is now more than eight years old, and Mr. Smith has no other drug-trafficking conviction. PSR ¶¶ 150–157.

## VI. CONCLUSION

Based on the foregoing, it respectfully is submitted that the Court should sentence Mr. Smith to a substantial downward variance from the advisory guideline range of 70 to 87 months, pursuant to the Sixth Amendment, *Apprendi*, *Booker*, and their progeny. Such a sentence would be "sufficient but not greater than necessary" to achieve an appropriate balance of the relevant sentencing factors and to achieve the attendant purposes of sentencing.

Respectfully submitted,

/s/ *Rocco C. Cipparone, Jr.*
Rocco C. Cipparone, Jr., Esquire
157 Bridgeton Pike, Suite 200-320
Mullica Hill, NJ 08062
(856) 547-2100
www.cipparonelaw.com
Attorney for Defendant Jalen Smith

Date: October 8, 2026

# DEFENDANT'S SENTENCING MEMO APPENDIX

September 21, 2026

To Whom It May Concern:

My name is Andre Brown. I am writing this letter on behalf of Jalen Smith. I have had the pleasure of knowing Jalen for over 15 years.

I first met Jalen, when he volunteered at Ashley Park Pre K-8 School, where I worked as a Health and Physical Education Teacher and Athletic Director. Jalen instantly made positive connections with the scholars, athletes, and staff. Over the years, Jalen continued to support our athletic program by working hands on with aspiring basketball players who respected his positive energy and direct coaching.

It is my belief that with continued support from family and friends Jalen can be a positive asset in any community. I pray that Jalen is given an opportunity to make the positive contributions to society that I know he is capable of. Thank you for your time.

Sincerely,

Andre Brown
Email: [redacted]
Phone: [redacted]

To Whom It May Concern:

This letter is written in support of Jalen Smith and to speak to his character, integrity, leadership, and commitment to serving his community. Throughout his life, he has consistently demonstrated a willingness to dedicate his time, knowledge, and talents to helping others, particularly children and young people.

One of the many ways Mr. Smith has given back to his community is through athletics. He has served as a referee for both basketball and baseball, helping to provide young athletes with a positive, structured, and fair environment in which to compete. In addition to officiating, he has coached a boys' AAU basketball team. In this role, he has taken responsibility for teaching young athletes not only the fundamentals of the game, but also the importance of teamwork, discipline, respect, accountability, and sportsmanship.

His commitment to supporting young people extends well beyond athletics. Mr. Smith has volunteered his time tutoring students in mathematics, using his knowledge and patience to help them better understand their schoolwork and develop greater confidence in their abilities. He has also volunteered at the middle school level, assisting a basketball coach and supporting students both on and off the court.

Through these experiences, Mr. Smith has demonstrated a genuine willingness to invest in the growth and development of young people. Whether serving as a referee, coach, mentor, or tutor, he has consistently used his time and abilities to create positive opportunities for children and families within his community.

His continued commitment to volunteerism and mentorship reflects an understanding of the importance of service and the responsibility individuals have to positively contribute to the lives of others. His actions demonstrate leadership, dependability, patience, and a willingness to step forward when his community needs support.

Mr. Smith should be recognized for the meaningful ways he has chosen to give back to his community. His experiences and continued service speak strongly to his character and his commitment to being a positive influence on those around him.

Sincerely,

Bryant L. Clifton
Educator

Mrs. Robin Dawkins
2823 Turquoise Circle
Davidson, NC 28036
[redacted]

September 29, 2026

To the Honorable Court:

I have known Jalen Smith since the day he was born. His mother is one of my oldest friends. We graduated from the same university, where our friendship grew even closer, and we have remained close to this day. We shared in raising our children, all boys, and I remember them as good boys. I have had the privilege of watching Jalen grow up.

What stands out most to me about Jalen is his heart. I have personally witnessed him give to others and help people without looking for anything in return. That kind of generosity cannot be measured by a title or an accomplishment; it shows itself in how a person treats others. It reflects the care with which his mother raised him.

Jalen also has a natural way with people. His voice is warm, his manner is easy, and he can make someone feel comfortable even when they have only just met. He is able to bring people together and encourage them to act. I have seen that same ability to lead alongside the talent and dedication he brought to basketball throughout his childhood and into college.

His care for others extends into the community. Jalen referees basketball games, coaches basketball, and tutors both basketball players and coaches without charging them. He has also helped financially sponsor community sporting events for youth. He gives his time, knowledge, and resources to help young people have opportunities to learn and play.

I understand that Jalen is before the Court on serious charges. I do not know the facts the Court must decide, and I would not presume to speak to them. I can speak only to the young man I have known: a person capable of kindness, connection, and helping others. Those qualities are real, and I hope the Court will consider them as it comes to know him as a person.

Thank you for taking the time to read my letter and consider my perspective.

Respectfully,

Robin Dawkins

Garinger High School
1100 Eastway Drive
Charlotte, NC 28205

Phone [redacted]
Fax

I am honored to write this character reference letter on behalf of Jalen Smith, whom I have known for nearly all of his life. I have had the privilege of watching Jalen grow from a young boy into a responsible, accomplished, and caring young man.

During his school years, Jalen was a scholar-athlete, demonstrating the importance of balancing academics, athletics, discipline, and commitment. He understood that success required hard work both in the classroom and on the playing field. Upon graduation, he continued to demonstrate those same qualities through his involvement in his community and his dedication to helping young people.

Jalen's involvement in youth sports and education reflects not only his willingness to serve others, but also his genuine desire to make a positive difference in the lives of young people. He has served as a referee for both basketball and baseball, helping provide young athletes with a positive, structured, and fair environment in which to compete.

He has also assisted with coaching a boys' AAU basketball team, taking on the responsibility of teaching not only the fundamentals of the game, but also important life lessons such as teamwork, discipline, respect, responsibility, and accountability. Through his involvement, Jalen has demonstrated that he understands the influence a coach and mentor can have on youth

In addition to sports, Jalen has volunteered at various community events, participated in youth programs, and taken on leadership and mentoring roles. He consistently gives his time and energy to help others, especially young people who benefit from having positive role models.

What stands out most to me about Jalen is his character. I have watched him mature and develop into someone who cares about his community and understands the importance of giving back. He is respectful, dependable, hardworking, and willing to step up when needed.

I believe Jalen has much to contribute to his community and to the lives of the young people he continues to serve.

Please feel free to contact me if additional information is needed.

Sincerely,

Tanya Filmore

Tanya Filmore

**October 6, 2026**

**Re: Character Reference for Jalen Smith**

**To Whom It May Concern:**

My name is Katrina Hudson, and I am writing to respectfully provide a character reference for my brother-in-law, Jalen Smith. I understand the seriousness of the circumstances that have brought him before the Court, and I do not intend to minimize or excuse those circumstances. Rather, I would like to share my personal experience with Jalen and the person I have known him to be throughout the years.

I've had the privilege of knowing him for nine years, and throughout that time, I have come to know him as a kind, dependable, hardworking, and incredibly selfless person. More importantly, I have personally witnessed the tremendous impact he has had on our family, particularly through the love, support, and care he provides to my children—his nieces and nephews.

Jalen has become an invaluable part of our family and has consistently gone above and beyond to help us in our daily lives. He is always willing to step in when we need an extra hand, whether that means helping around the house, assisting with household responsibilities, or spending time with the children. His willingness to help is never something we take for granted. He does these things because he genuinely cares about our family and wants to make our lives easier.

One of the ways he has been particularly helpful is with my children. He regularly spends time with them, helps them with their homework, and makes sure they have the support and encouragement they need to be successful. He is patient with them and takes an active interest in their education and development. His involvement goes far beyond simply being a family member—he has taken on the role of a trusted and supportive adult in their lives.

He has also made a tremendous effort to be present for their extracurricular activities. Whether attending activities, events, or other important moments in their lives, Jalen makes an effort to show up for them. He takes the initiative to practice sports with them outside of their scheduled activities, simply because he wants to support them, encourage their interests, and help them develop their skills. His presence means a great deal to my children because they know that their uncle is someone they can count on. He celebrates their accomplishments, encourages them when things are difficult, and makes them feel supported and valued.

In addition to his involvement with the children, Jalen has consistently contributed to our household. He willingly helps with everyday responsibilities and never hesitates to pitch in when something needs to be done. His assistance has been especially meaningful during busy or challenging periods when having another dependable person to rely on makes an enormous difference. He does not wait to be asked or look for recognition; he simply sees what needs to be done and helps.

Jalen is also an important part of our family gatherings and has always made an effort to participate and be present. From birthdays to holidays, Jalen values family relationships and demonstrates that through his actions. His involvement has helped create meaningful memories for our family and has strengthened the relationship he has with my children.

What stands out most about Jalen is the consistency of his character. He is dependable, compassionate, responsible, and willing to put the needs of others before his own. My children know they can rely on him, and our family knows that we can count on him when we need support. Those qualities are not simply things I can say about him—they are qualities I have personally witnessed through his actions over the years.

I am grateful that my children have Jalen in their lives. Having an uncle who is so actively involved, supportive, and caring has been a tremendous blessing to them and to our entire family. I have the utmost respect for him and believe he is a person of strong character who makes a positive difference in the lives of those around him.

I am happy to provide this letter in support of Jalen. Please feel free to contact me at [redacted] or [redacted] if I can provide any additional information.

**Sincerely,**

Katrina Hudson
Sister-In-Law
[redacted]

September 18th, 2026

Re: Character Reference for Jalen Smith

Dear Judge,

My name is Sonya McKelvey-Whitener and I am a former educator. I am writing this letter to offer my perspective on the character of Jalen Smith, whom I have known for nearly two decades. I first met Jalen when I supported him in math during his middle school years, and I have proudly maintained a relationship with him as he has grown into a 30-year-old adult.

Working with a student in mathematics provides a clear view of how they handle frustration, solve problems, and approach difficult challenges. During our time working together in math, Jalen consistently stood out for his determination, respectfulness, and strong work ethic. He never shied away from hard work and always showed a genuine desire to learn and improve, traits that he has carried firmly into his adult life.

I am fully aware of the legal situation that Jalen is currently facing. While I understand the seriousness of these proceedings, I can state with absolute certainty that this situation is completely out of character for him. It does not define the responsible, resilient man I have watched him become. Over the last 15-plus years, Jalen has faced life's challenges with accountability and a constant desire to better himself.

Because I know the depth of his character and his long history of positive behavior, I have complete confidence that he will learn from this experience and continue to be a productive, law-abiding member of our community.

I respectfully ask that you consider Jalen's long-term history, his strong personal character, and his capacity for positive growth when making your determination. Thank you for your time and your consideration of this statement.

Sincerely,

Sonya McKelvey-Whitener

Sonya McKelvey-Whitener

Former Multi-Classroom Teacher, Governor's Village STEM Academy

Email: [redacted]

4901 Water Oak Road, Apt. 7 [redacted]

Dear Honorable Judge,

I am writing to offer my character reference for Jalen Smith. I would have welcomed the opportunity to be present in court today with Jalen and his family; however, due to work obligations, I am unable to attend. Please accept this letter on my behalf.

I have had the privilege of knowing Jalen for nearly his entire life and have watched him grow and develop over time. Our families share a close relationship, which has allowed me to observe his character both personally and within the community.

While he is not perfect, he has been raised in a supportive and nurturing home by his mother/stepfather, who is deeply committed to his overall well-being. Their guidance, along with a strong village of support, is clearly reflected in the values Jalen demonstrates each day.

Jalen is surrounded by positive influences, including a devoted sibling (bother) and the village who offers encouragement and support. It is evident that he has a community of individuals who genuinely care about him and are invested in his growth and success.

I have personally observed Jalen demonstrate kindness toward others, takes responsibility for his actions, and consistently puts forth his best effort. He is known in the community as a helper who is selfless, respectful, dependable, and hardworking.

Jalen has a genuine love for sports, especially basketball. He is passionate about coaching and training athletes and takes great pride in helping others reach their full potential. Jalen has a unique ability to bring out the very best in every athlete he trains. Through his encouragement, dedication, and positive influence, he helps athletes build confidence, develop their skills, and strive for excellence.

He has refereed both basketball and baseball, providing positive leadership and helping young athletes learn the importance of teamwork, discipline, sportsmanship, and

accountability. In addition to his involvement in athletics, Jalen has also tutored young people in mathematics, using his knowledge and patience to help students strengthen their academic skills. Through his service in both sports and education, Jalen continues to make a positive impact on the lives of young people.

Jalen is not only passionate about sport; he is passionate about people. His commitment to serving others and helping young athletes grow makes him a positive role model in his community.

While I understand the seriousness of the matter before the court, I respectfully ask you consider Jalen's strong support system, his demonstrated character, and his willingness to learn and grow from this experience.

Thank you for your time and consideration.

Yolanda M. Polk
Success Is A Journey, LLC
P.O. Box 26161
Charlotte, NC 28221
O: [redacted]
"Success Is A Journey Not A Sprint "

**Character Reference Letter**

Otisquest Posey
2805 Trestle Court
Concord, NC 28025
[redacted]

September 24, 2026

To Whom It May Concern:

I am writing this letter on behalf of **Jalen Smith**. I have had the privilege of knowing him for most of his life and have watched him grow from a young boy into a respectful and caring young man.

Throughout the years, I have observed many positive qualities that speak to his character. He has consistently demonstrated kindness, respect for others, and a willingness to help those around him. He has always treated family members, friends, and members of the community with courtesy and consideration.

Like many young people, he has faced challenges and made mistakes along the way. However, I have seen firsthand his ability to learn from difficult experiences, accept responsibility, and strive to make better decisions. His actions do not define the person I have come to know. Instead, I believe they represent a moment in his life from which he can grow and mature.

I know him to be a person with a good heart, strong potential, and the desire to build a positive future for himself. He has qualities that can contribute positively to his family and community, and I firmly believe he deserves the opportunity to continue moving forward in a productive direction.

Based on my personal knowledge of his character and the many years I have known him, I respectfully ask that you consider this letter as evidence of his positive qualities and potential. I am confident that he can learn from this experience and continue to become a responsible and successful adult.

Thank you for your time and consideration.

Sincerely,

**Otisquest Posey**

PRESS RELEASE

# Former Adidas Executive, Former Adidas Consultant, And Aspiring Manager All Sentenced To Prison Terms For Their Roles In Defrauding Adidas-Sponsored NCAA Division I Universities

Tuesday, March 5, 2019

**For Immediate Release**

U.S. Attorney's Office, Southern District of New York

Robert S. Khuzami, the Attorney for the United States, Acting Under Authority Conferred by 28 U.S.C. § 515, announced today that former Adidas director of global sports marketing for basketball, JAMES GATTO, a/k/a "Jim," was sentenced to nine months in prison, former Adidas consultant MERL CODE was sentenced six months in prison, and sports business manager CHRISTIAN DAWKINS was sentenced to six months in prison, after having been found guilty in October 2018 by a federal jury of wire fraud and wire fraud conspiracy charges. The defendants were sentenced in Manhattan federal court by U.S. District Judge Lewis A. Kaplan, who also presided over the jury trial.

Attorney for the United States Robert Khuzami said: "The sentences imposed today only begin to reflect the magnitude of the harm these defendants caused through a scheme that not only defrauded multiple public universities but upended the lives of young student-athletes and corrupted a game cherished by so many. Today's sentences send a clear message to those who might be similarly tempted to corrupt collegiate athletics for their own personal gain that defrauding schools in connection with athletic scholarships is not just a rules violation but a crime, one that will result in a prison term."

According to the allegations contained in the Complaint, Indictment, Superseding Indictment, evidence presented during the trial, and statements made in Manhattan federal court:

Overview of the Scheme

GATTO, CODE, and DAWKINS, including with the assistance of Thomas Gassnola, a former Adidas consultant, and Munish Sood, a financial adviser, brokered and facilitated payments funded by Adidas to the families of high school and college-aged basketball players in connection with decisions by those players to commit to Adidas-sponsored schools and a promise that the players also would retain the services of DAWKINS and sign lucrative endorsement deals with Adidas upon turning professional. The payments, which the defendants took great lengths to conceal from the victim-universities, served to defraud the relevant universities in several ways.

First, because the illicit payments to the families of student-athletes rendered those student-athletes ineligible to participate in collegiate athletics, scheme participants conspired to conceal these payments from the universities, thereby causing them to provide or agree to provide athletic-based scholarships and financial aid under false and fraudulent pretenses. Indeed, the defendants and their co-conspirators, who included the families of the student-athletes and, in certain instances, one or more corrupt coaches at the universities, knew that, for the scheme to succeed and the athletic scholarships to be awarded, the illicit payments had to be concealed from the universities, and that certifications would be submitted to the universities falsely representing that the student-athletes were eligible to compete in Division I athletics.

Second, the scheme participants further defrauded the universities by depriving the universities of significant and necessary information regarding the non-compliance with NCAA rules by the relevant student-athletes and their families, and, in some cases, by certain corrupt coaches involved in the scheme. In doing so, the scheme participants interfered with the universities' ability to control their assets and created a risk of tangible economic harm to the universities, including, among other things, decision-making about the distribution of their limited athletic scholarships; the possible disgorgement of certain profit-sharing

by the NCAA; monetary fines; restrictions on athlete recruitment and the distribution of athletic scholarships; and the potential ineligibility of the universities' basketball teams to compete in NCAA programs generally, and the ineligibility of certain student-athletes in particular.

The University of Louisville Scheme

Beginning in approximately May 2017, GATTO, CODE, DAWKINS, and others worked together to illicitly funnel approximately $100,000 from Adidas to the father of Brian Bowen, then a top-rated high school basketball player, in connection with Bowen's commitment to play at the University of Louisville, a school whose athletic programs are sponsored by Adidas. Because the payments to the family of Bowen were both in violation of NCAA rules and illegal, the defendants took steps to conceal them from the University, including funneling the money indirectly through an amateur team affiliated with CODE and a corporation controlled by DAWKINS. The payments were all funded by Adidas pursuant to phony invoices approved by GATTO, and the first installment was delivered to Bowen's father in cash in July 2017 in a parking lot in New Jersey.

The University of Kansas Scheme

Between 2016 and 2017, GATTO and Gassnola worked together to funnel approximately $90,000 from Adidas to the family of Billy Preston, then a high school basketball player, in connection with Preston's commitment to play at the University of Kansas, a university whose athletic programs are sponsored by Adidas. To conceal the payments from the University, GATTO routed the money to Billy Preston's family indirectly, through an Adidas-sponsored amateur team affiliated with Gassnola, and pursuant to sham invoices approved by GATTO.

In addition, in the summer of 2017, GATTO and Gassnola agreed to funnel money to the legal guardian of Silvio De Sousa, then a high school basketball player, in connection with De Sousa's commitment to play at the University of Kansas. In one instance, GATTO and Gassnola were intercepted over a wiretap discussing a $20,000 payment to the legal guardian.

The North Carolina State University Scheme

In approximately November 2015, GATTO and Gassnola agreed to funnel approximately $40,000 from Adidas to the family of Dennis Smith Jr., then a high school basketball player, in order to stop Smith Jr. from de-committing from North Carolina State University, a university whose athletic programs are sponsored by Adidas. Gassnola flew to North Carolina to personally deliver the money in cash to a basketball coach at North Carolina State University, who then routed the money to Smith Jr.'s family. After Gassnola made the payment, GATTO reimbursed Gassnola via his Adidas-sponsored amateur team.

* * *

In addition to the prison sentences, Judge Kaplan ordered CODE, 45, of Greer, South Carolina, and DAWKINS, 26, of Atlanta, Georgia, to each pay restitution to the University of Louisville in the amount of $28,261. The court reserved the decision on the restitution for GATTO, 48, of Wilsonville, Oregon, and set a conference for April 9, 2019, at 10 a.m. Each of the three defendants was sentenced to two years of supervised release.

Gassnola and Sood have previously pled guilty and are awaiting sentence.

Mr. Khuzami thanked the FBI and the Special Agents of the U.S. Attorney's Office of the Southern District of New York for their tireless efforts during the investigation and prosecution of this case.

The case was prosecuted by the Office's Public Corruption Unit. Assistant United States Attorneys Edward B. Diskant, Noah Solowiejczyk, Eli J. Mark, and Aline R. Flodr are in charge of the prosecution.

*Updated March 5, 2019*

**Topic**

**PUBLIC CORRUPTION**

**Component**

USAO - New York, Southern

Press Release Number: 19-060

## Related Content

PRESS RELEASE

### Rikers Island Correction Officer Sentenced To 15 Months In Prison For Making False Statements To Obtain Workers' Compensation Benefits Following Use-Of-Force Incidents

United States Attorney for the Southern District of New York, Jay Clayton, announced that TODD FAUSTIN, a former correction officer at Rikers Island, was sentenced today to 15 months in...

July 14, 2026

PRESS RELEASE

### Chief Financial Officer Pleads Guilty To Conspiracy To Launder $67 Million Dollars In Fraud Proceeds

United States Attorney for the Southern District of New York, Jay Clayton, announced that WEIDONG GUAN, a/k/a "Bill Guan," the former Chief Financial Officer of The Epoch Times Association, Inc. (the "Epoch...

July 10, 2026

PRESS RELEASE

### Vietnamese National Pleads Guilty To Conspiring To Commit Identity Theft In Connection With $67 Million Dollar Money Laundering Scheme

United States Attorney for the Southern District of New York, Jay Clayton, announced that LE VAN HUNG, a/k/a "Hung Van Le," a/k/a "Van Hung Le," pled guilty to participating in a...

June 29, 2026

**Southern District of New York**
26 Federal Plaza, 37th Floor
New York, NY 10278

Main Office & Criminal Division: (212) 637-2200

PRESS RELEASE

# Aspiring Manager And Former Adidas Consultant Sentenced To Prison Terms For Bribing NCAA Division I Men's College Basketball Coaches

Friday, October 4, 2019

**For Immediate Release**

U.S. Attorney's Office, Southern District of New York

Geoffrey S. Berman, the United States Attorney for the Southern District of New York, announced that CHRISTIAN DAWKINS was sentenced to twelve months and a day in prison, and MERL CODE was sentenced to 3 months in prison, after having been found guilty in May 2019 of engaging in a scheme to bribe multiple NCAA Division I men's college basketball coaches. The defendants were sentenced in Manhattan federal court by U.S. District Judge Edgardo Ramos, who also presided over the jury trial. Both sentences are in addition, and will run consecutive, to sentences previously imposed on both defendants by U.S. District Judge Lewis A. Kaplan for their roles in a separate scheme to defraud Adidas-sponsored universities by making illicit cash payments to the families of college-bound student-athletes and concealing those payments from the schools.

Manhattan U.S. Attorney Geoffrey S. Berman said: "Christian Dawkins and Merl Code have now been sentenced to prison a second time for their roles in corrupting the world of college basketball. The sentences imposed this week should make crystal clear to other members of the basketball underground exposed during the various prosecutions brought by this Office that bribery is still a crime, even if the recipient is a college basketball coach, and one that will result in term of incarceration."

According to the allegations contained in the Complaint, Indictment, Superseding Indictment, and evidence presented during the trial in Manhattan federal court:

Overview of the Scheme

DAWKINS and CODE agreed to pay bribes to various NCAA Division I men's college basketball coaches in exchange for those coaches' exerting their influence over the student-athletes that they coached in order to retain the services of DAWKINS and a new sports management business (the "Dawkins Company") that he had recently started.

Prior to founding the Dawkins Company, from in or about 2015 until in or about May 2017, DAWKINS worked for a major sports agency recruiting high school and college basketball players as clients. In connection with his work for the sports agency, DAWKINS paid bribes to Lamont Evans, who at the time was an assistant coach at the University of South Carolina, in order for Evans to exert his official influence over student-athletes he coached to retain the services of the sports agency that employed DAWKINS. DAWKINS subsequently introduced Louis Martin Blazer III, a financial advisor who, unbeknownst to DAWKINS, was cooperating with the Government, and Munish Sood, another financial advisor, to Lamont Evans in order for them to continue paying bribes to him.

In or about May 2017, DAWKINS was terminated from his job at the sports agency and started the Dawkins Company with Munish Sood and another investor who, unbeknownst to DAWKINS, was an undercover law enforcement officer ("UC-1"). In order to recruit future clients, DAWKINS proposed, among other things, paying bribes to coaches at various NCAA Division I universities so that these coaches would steer their student-athletes to retain the services of the Dawkins Company. DAWKINS thereafter proposed paying bribes to Emanuel "Book" Richardson, an assistant coach at the University of Arizona. Soon thereafter, DAWKINS arranged for Richardson to travel to New York City in order to receive a $5,000 cash bribe. Weeks later, Richardson requested an additional $15,000 from DAWKINS, which Richardson said he would use in order to secure the commitment of a top high school basketball player to attend the University of Arizona, who Richardson would then steer to retain the services of DAWKINS and his company. DAWKINS arranged for UC-1 and Munish Sood to pay Richardson an additional $15,000 cash bribe in New Jersey in or about July 2017.

In or about June 2017, DAWKINS introduced Sood, UC-1, and Blazer, among others, to MERL CODE, who at the time was a consultant for Adidas, in order for CODE to work with the Dawkins Company to recruit future clients. During the initial meeting, DAWKINS, CODE, Sood, Blazer and UC-1 discussed, among other things, CODE's ability to identify and connect the Dawkins Company with corrupt college basketball coaches willing to accept money. At the end of the meeting, CODE received a $5,000 cash payment from UC-1 on behalf of the Dawkins Company.

In or about July 2017, DAWKINS and CODE discussed by telephone, among other things, CODE introducing UC-1 to various men's college basketball coaches at an upcoming recruiting event in Las Vegas, Nevada, and that CODE would be paid $5,000 for each men's college basketball coach that he introduced to DAWKINS and UC-1. CODE later sent a text message to DAWKINS containing a list of coaches that CODE had set up meetings with in Las Vegas, Nevada, including the dates and times of each of the meetings, for the purpose of DAWKINS and his company arranging to bribe them. In advance of the meetings, CODE advised UC-1 and DAWKINS that they should tell the coaches they would meet with that they would be available to provide them with money in the future, including with respect to any future financial needs these coaches had in connection with recruiting.

In Las Vegas, several coaches received cash bribes during their meetings with DAWKINS, and other coaches DAWKINS agreed to pay later as needed, in exchange for them using their influence to steer players to the Dawkins Company. Anthony Bland, an assistant coach at the University of Southern California, and an assistant coach from Creighton University -- two of the coaches that were on the list of meetings that CODE sent to DAWKINS by text message -- met with DAWKINS, UC-1 and Blazer in Las Vegas in July 2017 and accepted cash bribes. During the meeting in Las Vegas, Bland accepted a cash bribe and confirmed that he would use his influence to steer student-athletes at the University of Southern California to retain the Dawkins Company. During the trip to Las Vegas, Nevada, DAWKINS, Blazer and UC-1 also met with a third coach from Texas Christian University and paid this coach a cash bribe, as well.

After these meetings, DAWKINS discussed with college coaches who had been bribed players that they could steer to DAWKINS and his new company. For example, in August 2017, Anthony Bland, an assistant coach at the University of Southern California, facilitated meetings between DAWKINS and Sood, and the family members of a then-current student-athlete on the University of Southern California men's basketball team, as well as a family member of a different student-athlete who was a rising freshman planning to play for the University of Southern California men's basketball team the next season. During a meeting on the campus of the University of Southern California in or about August 2017, Bland informed DAWKINS and Sood that if they continued to fund payments to family members of University of Southern California men's college basketball players and recruits that Bland would use his position as an assistant coach to influence these players to retain the Dawkins Company.

* * *

DAWKINS, 26, of Los Angeles, California, and CODE, 45, of Greer, South Carolina, were also sentenced to 2 years of supervised release.

Mr. Berman praised the work of the FBI and the Special Agents of the United States Attorney's Office for the Southern District of New York.

The case is being handled by the Office's Public Corruption Unit. Assistant United States Attorneys Robert L. Boone, Noah Solowiejczyk, and Eli J. Mark are in charge of the prosecution.

*Updated October 4, 2019*

**Topic**

**PUBLIC CORRUPTION**

**Component**

USAO - New York, Southern

Press Release Number: 19-325

## Related Content

PRESS RELEASE

### Rikers Island Correction Officer Sentenced To 15 Months In Prison For Making False Statements To Obtain Workers' Compensation Benefits Following Use-Of-Force Incidents

United States Attorney for the Southern District of New York, Jay Clayton, announced that TODD FAUSTIN, a former correction officer at Rikers Island, was sentenced today to 15 months in...

July 14, 2026

PRESS RELEASE

### Chief Financial Officer Pleads Guilty To Conspiracy To Launder $67 Million Dollars In Fraud Proceeds

United States Attorney for the Southern District of New York, Jay Clayton, announced that WEIDONG GUAN, a/k/a “Bill Guan,” the former Chief Financial Officer of The Epoch Times Association, Inc. (the “Epoch...

July 10, 2026

PRESS RELEASE

### Vietnamese National Pleads Guilty To Conspiring To Commit Identity Theft In Connection With $67 Million Dollar Money Laundering Scheme

United States Attorney for the Southern District of New York, Jay Clayton, announced that LE VAN HUNG, a/k/a “Hung Van Le,” a/k/a “Van Hung Le,” pled guilty to participating in a...

June 29, 2026

**Southern District of New York**
26 Federal Plaza, 37th Floor
New York, NY 10278

Main Office & Criminal Division: (212) 637-2200

PRESS RELEASE

# Division I Men's College Basketball Coaches Sentenced For Their Roles In Bribery Scheme

Friday, June 7, 2019

**For Immediate Release**

U.S. Attorney's Office, Southern District of New York

Geoffrey S. Berman, the United States Attorney for the Southern District of New York, announced today that LAMONT EVANS, a former assistant men's basketball coach at the University of South Carolina ("South Carolina") and Oklahoma State University ("OSU"), and EMANUEL RICHARDSON, a/k/a "Book," a former assistant men's basketball coach at the University of Arizona ("Arizona"), were each sentenced to three months in prison, and that ANTHONY BLAND, a/k/a "Tony," a former assistant men's basketball coach at the University of Southern California ("USC"), was sentenced to a term of probation, each for accepting cash bribes from athlete advisers in exchange for using their influence over the student-athletes they coached to retain the services of the advisers paying the bribes. The defendants were sentenced this week in Manhattan federal court by U.S. District Judge Edgardo Ramos.

Manhattan U.S. Attorney Geoffrey S. Berman said: "Anthony Bland, Emanuel Richardson, and Lamont Evans, all former men's basketball coaches at NCAA Division I universities, abused their positions as mentors and coaches for personal gain. They took bribes from unscrupulous agents and financial advisers to steer their players to those agents and advisers. For their crimes, Richardson and Evans will serve time in federal prison, while Bland will serve a sentence of probation. These convictions and sentencings send a strong message that bribery in the world of college basketball is a crime, and that those who participate in such crimes will be held accountable for their corrupt actions."

According to the allegations contained in the Complaint, Indictment, Superseding Indictment, evidence presented during the trial, and statements made in Manhattan federal court:

Overview of the Scheme

The U.S. Attorney's Office for the Southern District of New York and the Federal Bureau of Investigation ("FBI") have been investigating the criminal influence of money on coaches and student-athletes who participate in intercollegiate basketball governed by the NCAA. The investigation revealed that numerous basketball coaches at NCAA Division I universities, including EVANS, RICHARDSON, and BLAND, received bribes and agreed to receive bribes in exchange for agreeing to pressure and exert influence over student-athletes under their control to retain the services of the bribe payers, including Christian Dawkins, Merl Code, and Munish Sood, once the athletes entered the National Basketball Association ("NBA").

Beginning in 2016, and continuing into September 2017, when EVANS was arrested, EVANS received approximately $22,000 in cash bribes from current and aspiring financial advisers and/or managers, including Dawkins and Sood, in exchange for EVANS's agreement to exert his influence over certain student-athletes EVANS coached at South Carolina and OSU to retain the services of the bribe payers once those players entered the NBA. In one meeting recorded during the investigation, EVANS explained how "every guy I recruit and get is my personal kid," and that "the parents believe in me and what I do . . . that's why I say, if I need X, so if I do take X for that, it's going to generate [business] toward you guys," referring to the bribe payers. EVANS also stated in a call recorded during the investigation how this arrangement was "generating more wealth" for the scheme participants, because they were "able to scratch my back, scratch yours, and help each other with different things and . . . at the same time get compensated and then . . . just go from there." In return for the cash bribes EVANS received, EVANS, including at in-person meetings, attempted to pressure a player at OSU, and a relative of a different player attending South Carolina, into retaining the financial services of the bribe payers.

Beginning in or around February 2017, and continuing into September 2017, when RICHARDSON was arrested, RICHARDSON received approximately $20,000 in cash bribes from Dawkins and Sood in exchange for RICHARDSON's agreement to exert his

influence over certain student-athletes RICHARDSON coached at Arizona to retain the services of Dawkins and Sood once those players entered the NBA. For example, in discussing his commitment to steering Arizona players to retain the bribe payers upon entering the NBA, RICHARDSON told an undercover FBI agent and others, during a recorded meeting, "I used to let kids talk to three or four guys, but I was like, why would you do that? You know that's like taking a kid to a BMW dealer, a Benz dealer, and a Porsche dealer. They like them all . . . You have to pick for them." In return for the cash bribes RICHARDSON received, RICHARDSON facilitated a meeting between the bribe payers, including Dawkins and Sood, and a relative of a player attending Arizona for the purpose of pressuring that player to retain the financial services of the bribe payers.

Beginning in or around July 2017, and continuing into September 2017, when BLAND was arrested, Dawkins paid a cash bribe to BLAND in exchange for BLAND's agreement to exert his influence over certain student-athletes BLAND coached at USC, and to retain Dawkins's and Sood's business management and/or financial advisory services once those players entered the NBA. In particular, as BLAND told Dawkins and Sood during a recorded meeting, in return for their bribe payment, "I definitely can get the players. . . . And I can definitely mold the players and put them in the lap of you guys." As part of the scheme, BLAND facilitated a meeting between Dawkins and Sood and a relative of a player attending USC, and a meeting between Dawkins and Sood and a relative of a USC recruit, both for the purpose of pressuring those players to retain the financial services of Dawkins and Sood.

* * *

In addition to the prison sentences, Judge Ramos ordered LAMONT EVANS, 41, of Deerfield Beach, Florida, to pay forfeiture in the amount of $22,000, EMANUEL RICHARDSON, 46, of Tucson, Arizona, to pay forfeiture in the amount of $20,000, and ANTHONY BLAND, 39, of Gardena, California, to pay forfeiture in the amount of $4,100. Each of the three defendants was sentenced to two years of supervised release, and EVANS and BLAND were also each sentenced to 100 hours of community service.

Christian Dawkins and Merl Code were each found guilty by a unanimous jury on May 8, 2019, of one count of conspiracy to commit bribery, which carries a maximum sentence of five years in prison. Dawkins was also convicted of an additional count of bribery, which carries a maximum sentence of 10 years in prison. Sentencing is scheduled for August 15, 2019, before Judge Ramos.

Munish Sood, a financial adviser, previously pled guilty, pursuant to a cooperation agreement with the Government, in connection with this scheme and is awaiting sentence.

Mr. Berman praised the work of the FBI and the Special Agents of the United States Attorney's Office for the Southern District of New York.

The case is being handled by the Office's Public Corruption Unit. Assistant United States Attorneys Robert L. Boone, Noah Solowiejczyk, and Eli J. Mark are in charge of the prosecution.

*Updated June 7, 2019*

**Topic**

**PUBLIC CORRUPTION**

**Component**

USAO - New York, Southern

Press Release Number: 19-182

## Related Content

PRESS RELEASE

### Rikers Island Correction Officer Sentenced To 15 Months In Prison For Making False Statements To Obtain Workers' Compensation Benefits Following Use-Of-Force Incidents

United States Attorney for the Southern District of New York, Jay Clayton, announced that TODD FAUSTIN, a former correction officer at Rikers Island, was sentenced today to 15 months in...

July 14, 2026

PRESS RELEASE

### Chief Financial Officer Pleads Guilty To Conspiracy To Launder $67 Million Dollars In Fraud Proceeds

United States Attorney for the Southern District of New York, Jay Clayton, announced that WEIDONG GUAN, a/k/a “Bill Guan,” the former Chief Financial Officer of The Epoch Times Association, Inc. (the “Epoch...

July 10, 2026

PRESS RELEASE

### Vietnamese National Pleads Guilty To Conspiring To Commit Identity Theft In Connection With $67 Million Dollar Money Laundering Scheme

United States Attorney for the Southern District of New York, Jay Clayton, announced that LE VAN HUNG, a/k/a “Hung Van Le,” a/k/a “Van Hung Le,” pled guilty to participating in a...

June 29, 2026

**Southern District of New York**
26 Federal Plaza, 37th Floor
New York, NY 10278

Main Office & Criminal Division: (212) 637-2200

PRESS RELEASE

# Sterling Heights Man Sentenced for Sports Bribery

Wednesday, June 17, 2015

**For Immediate Release**

U.S. Attorney's Office, Eastern District of Michigan

A Sterling Heights man was sentenced to almost six years in federal prison today for sports bribery, fraud and unlawfully possessing a gun, U.S. Attorney Barbara L. McQuade announced today.

McQuade was joined in the announcement by Special Agent in Charge Paul M. Abbate, Federal Bureau of Investigation, Detroit Field Office, and Special Agent in Charge Anthony V. Mohatt, U.S. Department of Agriculture, Office of Inspector General.

U.S. District Judge Mark Goldsmith sentenced Ghazi Manni, 58, to 70 months in prison, three years of supervised release, and ordered him to pay restitution of $700,000 and to forfeit $700,000 to the government.

According to court records, between December 2005 and December 2006, Manni and codefendant Mitchell Karam, who is awaiting sentencing, paid money to a professional jockey to influence the results of races at Tampa Bay Downs in Tampa, Florida, and elsewhere. The indictment alleges that Manni and Karam then used the simulcast pari-mutuel wagering system to place bets on the fixed races. Manni pleaded guilty to paying University of Toledo athletes to affect the point spread of football and basketball games in 2005 and 2006. He also pleaded guilty to paying a jockey to fix horse races at a racetrack in Florida from 2004 to 2006. He also pleaded guilty to paying cash for food stamps at King Cole Foods in 2010 and 2011. Manni had been previously convicted by a jury of unlawfully possessing a gun and ammunition, and today was resentenced for those crimes as well.

Before imposing the sentence, Judge Goldsmith noted that Manni's crimes all were the product of deliberation and spanned long periods. He also noted that Manni's sports bribery crimes destroyed the careers of the athletes he had corrupted. Judge Goldsmith stated that the sentence was necessary to protect the public from further crimes by Manni.

"These bribery offenses were significant crimes not only because they affected fair play in the particular games and races involved, but also because they exploited young athletes and undermined public confidence in the sports themselves," McQuade said.

The sports bribery cases were investigated by special agents of the Federal Bureau of Investigation. The food stamp fraud case was investigated by the United States Department of Agriculture, Office of Inspector General.

*Updated June 18, 2015*

**Component**

USAO - Michigan, Eastern

## Related Content

PRESS RELEASE

**United States Attorney's Office for the Eastern District of Michigan Joins DOJ Fraud Division, SBA, and SBA OIG in Surge Takedown Exceeding $245 Million in COVID-era Loan Fraud**

September 14, 2026

PRESS RELEASE

**Melvindale Man Charged with Threatening to Kill ICE Agents**

July 21, 2026

PRESS RELEASE

**Ypsilanti man sentenced to 10 years in federal prison for distributing child sexually abusive material**

July 17, 2026

**Detroit Main Office**
211 W. Fort Street, Suite 2001
Detroit, MI 48226

**Flint Branch Office**
210 Federal Building
600 Church Street

Flint, MI 48502

**Bay City Branch Office**
101 First Street, Suite 200
Bay City, MI 48708

**Detroit:**
Phone: (313) 226-9100
TTD: (313) 226-9560
Fax: (313) 226-2311

**Flint:**
Phone: (810) 766-5177

TTD: (810) 766-5100
Fax: (810) 766-5427

**Bay City:**
Phone: (989) 895-5712
TTD: (989) 895-2501
Fax: (989) 895-5790

Latest Local News Live Shows ••• CBS NEWS

Archive

# ASU Point-Shaving Leader Sentenced

June 30, 1998 / 11:31 PM EDT / AP

Add CBS News on Google

The alleged mastermind of Arizona State's basketball point-shaving scandal was sentenced Tuesday to 46 months in prison, a tougher sentence than the government had sought.

Prosecutors had recommended that Benny Silman, 27, receive a 42-month sentence for rigging and gambling on the outcome of basketball games during the 1994 season, when he was an ASU student.

U.S. District Court Judge Robert Broomfield justified the harsher punishment by saying the scandal could discourage poor children from trying to succeed in sports and improve their lives.

**"The gambling here went beyond just yourself. It affects a lot of us,"** he said.

Silman entered a plea agreement with prosecutors in April, admitting five counts of sports bribery.

**"Through this all I think I've realized I was addicted to a lifestyle taken over by drug use, alcohol abuse and gambling,"** he said.

Silman admitted bribing Stevin **"Hedake"** Smith and Isaac Burton to miss shots during the 1994 season so he and other gamblers could beat the projected point spread in four games.

CBS

Read More

00:00 02:00

Smith and Burton pleaded guilty to their role in the scheme in December. Joseph Gagliano, 29, a Phoenix investment adviser, also pleaded guilty, as did alleged bookmakers Dominic Mangiamele, 61, of Mount Prospect, Ill., and his son, Joseph Mangiamele, 36, of Arlington Heights, Ill.

Silman is the first of the defendants to be sentenced. Assistant U.S. Attorney Joe Lodge said the others would likely receive reduced sentences because they cooperated with investigators.

**"I think 46 months in prison sends a message to the next would-be campus `bookkeeper,"**' he said.

Lodge said Silman would likely serve almost all of his prison sentence. He refused to say whether prosecutors were investigating other possible suspects.




Neither Silman, of North Hollywood, Calif., nor his lawyer, David Chenoff, would comment after the sentencing.

At Chenoff's request, Broomfield agreed to recommend that Silman serve his sentence at a federal minimum-security prison camp in Southern California. Broomfield also agreed to request that Silman be allowed to participate in a 500-hour drug program, and ordered him to get counseling for his gambling addiction.

The Mangiameles, Smith and Burton are scheduled for sentencing Sept. 28; Gagliano's sentencing is scheduled for Sept. 14.

The alleged conspirators placed more than 61 bets totaling $506,000 on the basketball games in what the FBI said was a major sports gambling scandal.

A federal grand jury returned a 72-count indictment in December against the Mangiameles, Silman and Gagliano, accusing them of sports bribery, money laundering and racketeering.

Smith, the Sun Devils' No. 2 all-time leading scorer, agreed to fix the four games for $20,000 a game, in part to erase a reported $10,000 gambling debt to Silman, according to Smith and Silman's plea agreements. Smith alsadmitted to recruiting Burton to take part in the scheme; Burton was paid $4,300 for helping fix two games.

©1998 The Associated Press. All Rights Reserved. This material may not be published, broadcast, rewritten, or redistributed

© 1998 The Associated Press. All Rights Reserved. This material may not be published, broadcast, rewritten, or redistributed.

**These 3 Common Phrases May Be The First Sign Of Cognitive Decline – Do You Say Them?**
PAID MEMORY HEALTH JOURNAL

**These Are the Coolest Gifts on Everyone's Wishlist in 2026**
PAID GADGET TREND

**MDs Say Cognitive Decline Begins When Seniors Often Say These 3 Phrases – See Which Ones**
PAID MEMORY HEALTH JOURNAL

**AI Stocks Look Unstoppable. The Warning Signs Say Something Very Different**
PAID THE SAFE MONEY REPORT Learn More

**Why Your Rotator Cuff Won't Heal (What Most Doctors Miss)**
PAID SHOULDER RELIEF NEWS

**New Jersey: Gov will cover the cost to install solar if you own a home here**
PAID ENERGYBILLCRUNCHER

**New Jersey: Worst Car Zip Codes for Overcharging Insurance (Is Yours On The List?)**
New Insurance Data Shows Which Zip Codes Save The Most
PAID OTTO INSURANCE Click Here

**Chronic tinnitus has been associated with a common practice**
PAID EAR.HEALTH | NEWS Learn More

**New Jersey: Worst Car Insurance Companies for Overcharging (Is Yours On The List?)**
Auto Insurance | Sponsored Learn more

**Walgreens Shoppers: This New 3-in-1 Blue Pill Is 'Worth Every Dollar'**
PAID AFTER FORTY Learn More

**I Asked ChatGPT What Rich People Do Differently. It Gave Me One Word.**
Not stocks. Not crypto. Not connections. The AI kept circling back to something far more ordinary — and far more powerful.
PAID BLINKIST MAGAZINE

**Chronic tinnitus has been associated with a common practice.**
PAID EARCARE | NEWS Learn More

**87% Of Memory Problems Linked To 3 Common Foods**
PAID VIEW Learn More

**Here Are the 27+ Coolest Gifts for This 2026**

PAID GIFT Read More

**Hiroshi Closes His Knife Shop After 55 Years**

PAID SAKURA KNIVES Learn More

**Memory Decline Begins When Seniors Say These 3 Phrases (See The List)**

PAID 50+ COGNITIVE INSIGHT Read More

**We've tested 27 popular teeth whitening products: These 5 are the best**

Here are the 5 winners

PAID CONSUMER REVIEWS Read More

**The 4 Blood Pressure Prescriptions Heart Specialists Never Touch**

PAID OLD HEART INSIGHTS Learn More

**Not Salt, Not Age: The #1 Trigger of High Blood Pressure After 55 Is a Kitchen Staple Seniors Use**

PAID FLUSH PRILL Learn More

**Otolaryngologists Say Chronic Tinnitus Is Linked To A Common Habit**

PAID NEWS NEBLON Learn More

**Plantar Fasciitis? Most People Buy Insoles. Insiders Do This Instead (It's Genius)**

PAID KOPREZ

**Sam's Club Is Offering Its Best Membership Deal of the Year: How to Join Sam's Club for Just $15**

**Sam's Club Memberships Are 50% Off! Hurry and Save BIG on September's Trending Products**

**MDs Tie 1 Common Boxed Cereal to Most Forgetfulness Cases in Seniors.**

PAID 50+ COGNITIVE INSIGHT

**The Missing Nutrient Behind Thin Hair**

PAID BEAUTIFUL HAIR AGAIN

**MDs Tie 1 Common Boxed Cereal to Declining Mental Sharpness in Seniors**

PAID NEUROBOOST US Learn More

**It's Not Salt: Japan's Doctors Found the #1 Trigger of High Blood Pressure After 55**

PAID FLUSH PRILL Learn More

**New Jersey: Worst Zip Codes for Overcharging Car Insurance (Is Yours On The List?)**

Car Insurance Data Shows Which Zip Codes Save The Most

PAID OTTO INSURANCE Learn More

**79-Year-Old Craftsman Closes His Knife Shop After 55 Years**

PAID SAKURA KNIVES Learn More




Copyright ©2026 CBS Interactive Inc. All rights reserved.